# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CT-00716-SCT

*OLIVER JOHNS, JR.*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT:               3/6/2003
TRIAL JUDGE:                    HON. MIKE SMITH
COURT FROM WHICH APPEALED:      PIKE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         PRO SE
ATTORNEYS FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                                BY: JEFFREY A. KLINGFUSS
DISTRICT ATTORNEY:              DEE BATES
NATURE OF THE CASE:             CIVIL - POST CONVICTION RELIEF
DISPOSITION:                    REVERSED AND REMANDED - 04/06/2006

**EN BANC.**

**GRAVES, JUSTICE, FOR THE COURT:**

¶1.     In November, 1996, Oliver Johns was convicted of aggravated assault in the Circuit

Court of Pike County and was sentenced to twenty years in prison.  Johns appealed the

conviction, and the Court of Appeals affirmed the trial court.  This Court denied the petition

for writ of certiorari filed in Johns's direct appeal.

¶2.     Following the denial of his direct appeal, Johns filed a petition for post-conviction

relief.  We granted Johns's petition for post-conviction relief.  After an evidentiary hearing

was held in the trial court, Johns's motion for post-conviction relief was denied.  Johns

appealed the denial of his motion. The Court of Appeals affirmed the judgment of the trial court and denied rehearing on July 26, 2005. We granted Johns's petition for writ of certiorari. We find that Johns did not receive constitutionally effective assistance of counsel. We reverse the judgments of the Court of Appeals and the Pike County Circuit Court, and we remand this case for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶3. On September 20, 1996, Oliver Johns was indicted by the Grand Jury of Pike County for the offenses of aggravated assault and shooting into a vehicle. The record reveals that the victim of the assault was shot in the finger and required stitches. Less than two months after he was indicted, Johns's trial was held, and he was convicted of the aggravated assault. Johns was sentenced to serve twenty years in prison.

¶4. The aggravated assault for which Johns was convicted happened some time between 8:00 p.m. and 8:19 p.m. on March 28, 1996, according to the victim, Kendall Jefferson. At 8:19 that evening, the police received a call that there had been a shooting. Jefferson testified that Johns passed him at a park and then turned around and followed his car. When he and his passenger, Vincent Holloway, got to a stop sign, Jefferson noticed that the car was still behind him, and shots were fired. Jefferson testified that he did not see who was shooting, but he was certain the shots were fired from the vehicle behind him that was allegedly driven by Johns. Other witnesses to the shooting were Rushard Haynes, Jefferson's cousin, who was driving the car that was immediately in front of Jefferson and who left the scene as soon as

2

he realized that shots were being fired. The passenger, Vincent Holloway, has never been found.

¶5. As a result of the shooting, Jefferson's finger was injured. He drove to the hospital immediately following the shooting. When officers arrived at the hospital, Jefferson would not cooperate with them by providing details about the shooting. When he decided to cooperate, he told them Johns was the shooter and proceeded to describe Johns's car. An officer then went to Johns's home, and Johns identified the car as his vehicle. The officer testified that when they examined Johns's car, they found no gunshot residue, no bullets, no casings, no guns, no fingerprints, and no other evidence that a gun was even shot from the vehicle. There was only Jefferson's testimony that the shots were fired from Johns's vehicle. Johns testified he was at home with his young daughter at the time of the shooting.

¶6. The jury deliberated at length before they returned a verdict of guilty on the charge of aggravated assault. Interestingly, Johns was acquitted on the charge of shooting into a motor vehicle. Oliver Johns began serving his 20 year sentence in 1996.

¶7. Johns filed a direct appeal from the conviction of the trial court. The Mississippi Court of Appeals affirmed the conviction, and this Court denied certiorari. *Johns v. State*, 746 So.2d 947 (Miss. App. 1999). Johns then filed an Application for Post-Conviction Relief, and we granted Johns's application for the purpose of conducting an evidentiary hearing on the issue of whether he was denied effective assistance of counsel.

¶8. On February 18, 2003, an evidentiary hearing was held in the Circuit Court of Pike County. At the evidentiary hearing, three witnesses came forward to testify that they saw

3

Johns with his one-year old daughter around the time of the shooting and that the two of them had walked to and from a nearby store during that time. These witnesses provided affidavits and testimony which verified that they were willing and available to testify at Johns's trial, but were not contacted by Johns's attorney regarding their testimony. John Jackson (Jackson) was Oliver Johns's attorney. He testified at the evidentiary hearing strictly from his recollection. When asked if he made a search to try to find his file in Johns's case when he became aware that the district attorney's office wanted him to testify, his response was unequivocally "No."

¶9. Jackson repeatedly stated he did not remember specific details regarding his representation of Johns. He did, however, remember (1) going to the scene of the shooting, and (2) talking to two people who may have been witnesses, but he did not remember who they were.

¶10. The trial court judge denied Johns's motion for post-conviction relief, finding Jackson's assistance was effective. In making this finding, the trial court judge relied on his personal knowledge of Jackson, stating "the trials that he's tried in my court, there's absolutely no doubt about John Jackson's truth and veracity. I have yet to find John (Jackson) tell me anything that did not add up or ... wasn't so." Four months later, Jackson was indicted for the sale of marijuana within a correctional facility and was later convicted and sentenced to serve a term of three years in the custody of the Mississippi Department of Corrections. He is presently suspended from the practice of law, pending the appeal of his

4

conviction. If his conviction is not overturned he will be disbarred. *Mississippi Bar v. Jackson*, 904 So.2d 109 (Miss. 2004).

¶11. Oliver Johns appealed the denial of his motion for post-conviction relief. The Court of Appeals affirmed the trial court. Johns filed a petition for writ of certiorari with this Court. We granted certiorari to finally determine the issue of whether Johns's counsel was, indeed, ineffective. We turn now to a discussion of Jackson's performance.

¶12. According to Johns, he retained the services of Jackson a few days after he was arrested. Johns approached Jackson at a retail store when he overheard him talking about a legal matter. Jackson did not have a law office, so all of the meetings with his client regarding his representation took place at either the courthouse or at McDonald's. Vanessa Williams, Oliver Johns's mother, provided testimony that she met Jackson once and asked him if he had an office. Jackson said he did not. She asked him for a business card, and Jackson said he did not have one. Williams then asked him how he could be reached, and Jackson told her he could not give her a number.

¶13. The day after meeting him at the retail store, Oliver Johns, Jr. met with Jackson at the local McDonald's and employed Jackson by paying him $500.00. Johns recalled that this meeting with Jackson lasted less than forty-five minutes. The $500 attorney fee was paid by Johns for representation at a preliminary hearing; however, Jackson later called Johns and told him that the preliminary hearing was not important, so they would not have it. Oliver Johns provided testimony that he hired Jackson after he (Johns) had been indicted, arrested, and had bonded out of jail. That he charged him for a preliminary hearing means either that

he did not even take the time to determine Johns' had already been indicted, or he simply wanted cash. It is elementary that there is no necessity for a preliminary hearing *after* an indictment.

¶14.    On October 1, 1996, ten days after Johns's indictment, an order was entered that waived John's preliminary hearing and set an omnibus hearing for October 10, 1996, nine days later. This October 1 order gave Jackson nine days to file any pre-trial motions on behalf of his client. In effect, Jackson was expected to properly investigate this case and uncover any evidence relating to Johns's charges in only nine days.

¶15.    Jackson did not take any action to delay the proceedings. After being hired to represent Johns, he had approximately fifteen days to obtain discovery from the prosecution, establish what the evidence was, investigate the case, and file pre-trial motions. Jackson testified regarding pre-trial preparation:

Do you have a memory as you sit here today of discussing the discovery material that you got in this case with Mr. Johns?

A.    I remember discussing the case in depth with him. But like I told you, I've tried over 100 cases since then and I don't remember this particular day that I discussed this Mr. Johns, no, I do not.

Q.    The physical evidence in this case, the photographs, the shell casings, when was the first time you ever showed those items to Mr. Johns?

A.    I don't remember.

Q.    Did you ever take him to the crime lab to see.....

A.    No.

Q.    Did you ever take him to the D.A.'s office?

A.    No.

Q.    Did you ever get prints made of the photographs that were in the D.A.'s possession?

A.    Now that, I don't remember.

¶16.    A couple of days after the first meeting, Johns and his father, Oliver Johns, Sr. (Johns, Sr.) met with Jackson at McDonald's. This meeting took place before the October 10 hearing. Johns, Sr. recalled that when he asked Jackson about the case, Jackson said that everything was going good. Jackson did not show them any documents related to the case, nor did he show them any evidence related to the case.[1] In fact, Jackson informed them that the State had no evidence against Oliver Johns, Jr. At this meeting, Jackson asked for more money. Johns, Sr. paid Jackson another $1000.00.

¶17.    Jackson next met with the Johns' at the Courthouse on October 10, 1996, the day of the omnibus hearing. Johns, Sr. remembered Jackson telling him basically the same thing about the case -- that it was going okay. He testified that at the time of the omnibus hearing he had already told Jackson that the alibi witnesses had information that would help them and that he and Oliver Johns had provided him with the witnesses addresses. Oliver Johns remembers that Jackson told him that the witnesses were not important. As was customary, Jackson requested even more money from the Johns' and, this time, was paid $500.00.

¶18.    Oliver Johns's mother, Vanessa Williams, provided testimony that she met Jackson once because Oliver Johns had to pay more legal fees. She asked Jackson if he had spoken with the witnesses. Jackson told her he did not have any transportation at that time so he could not get around. He told her he was planning to borrow his girlfriend's car and he would go see the witnesses then.

---

[1] This Court is not attempting to label Jackson ineffective for not showing evidence, as it was obvious the state had none.

7

¶19.	At the omnibus hearing on October 10, the matter was set for trial on November 8, 1996, less than a month later. Johns's case moved from indictment to verdict in less than forty-nine days, and there is no evidence Jackson tried to contact Johns during that time. Vanessa Williams, however, tried to contact Jackson and was unable to locate him. Williams was able to obtain a contact number for Jackson from her son's bail bondsman, so she called and left a message at the number. Williams testified that Jackson called her back that evening and was upset that she had called him at his girlfriend's house. Jackson told her he would call her when he needed to talk to her.

¶20.	On the eve of trial, November 7, 1996, Jackson called Johns. Jackson called Johns, Sr. at 9:00 p.m. and told them to meet him at McDonald's because the trial was the next day. The Johns' say that was the first time they knew there was a trial scheduled. Jackson, Johns, Sr., and Oliver Johns met at McDonald's at about 10:00 p.m. At this meeting, *the night before trial*, John Jackson had no file and no documents and met with the Johns' for about forty minutes. Both the Johns' provided sworn testimony that Jackson never discussed anything about Oliver testifying in his defense, except to say that he could testify in his own behalf if he wanted to testify. He never showed Oliver Johns any discovery provided by the state, nor did he show him any evidence. In fact, Johns, Sr, said that Jackson never had any paperwork or documents either of the times they met with him.

¶21.	Again, at McDonald's, Jackson solicited even more money from the Johns' and was paid another $500.00. Johns, Sr. testified that Jackson never had any paperwork, and that when he paid Jackson $500 that night, Jackson wrote him a receipt on a McDonald's napkin.

8

¶22.    Most importantly, at the last-minute meeting before trial, the Johns' asked what progress Jackson had made in speaking with their alibi witnesses. Oliver Johns testified that Jackson assured them he would speak to the witnesses that night. Johns, Sr. recalled that Jackson said he had not gotten around to talking to any of the witnesses, but he would see what he could do before trial the next day. Jackson has a different version of these events. He says he had already talked to the witnesses that Johns asked him to talk to, so talking to anyone on the night before trial would have been defeating his purpose.

¶23.    Jackson claims that during his investigation, he went to the scene of the crime and just walked around asking people if they knew what "went down" and what they knew about it. He stated that he did not necessarily know the names of the people, he just started asking. He also claimed to have asked some people from outside the area whom he thought might have been there or know something about it. Johns never claimed to have been at the scene of the crime; he claims to have been at home. If Jackson had done any independent investigation, then certainly one place to investigate would have been the place where his client claimed to be – his neighborhood.

¶24.    Next, Jackson claims he talked to two other people, but he doesn't know who they were. His testimony was that he refused to rely on these witnesses because he did not believe they would provide truthful testimony. The three witnesses who testified at the evidentiary hearing say Jackson never talked to them. Therefore, no one, including Jackson, is certain of the identity of these two mystery people to whom Jackson allegedly spoke.

¶25. Johns claimed all along that he was home alone with his young daughter. At this time, Johns's daughter was around 1 year old. At a minimum, the child's mother should have been contacted. Jackson did not even do that.

¶26. The morning of trial, the Johns' asked where the witnesses were. Jackson claimed that he spoke to one of the witnesses, and they could not help. The morning of the trial was the first time that Johns knew that no witnesses were going to be called on his behalf.

¶27. Before the jury was selected, Oliver Johns was advised that the prosecution would recommend a sentence of five to six years if he plead guilty. Jackson told him that the State had no evidence against him and that they would be able to win the case. Oliver Johns relied on this advice and went forward without accepting the plea.

¶28. Jackson's performance at trial was less than stellar, so much so that Johns, Sr., left during his son's trial to find another attorney. At another break, Jackson approached Johns, Sr. and asked him if he had any more money; Johns, Sr. went to the bank and got $500 for Jackson. After he returned and paid Jackson, his son was found guilty. The Johns' then hired another attorney for further representation. The grand total paid to Jackson for his assistance was $3000.00.

**DISCUSSION**

¶29. On appeal, the appropriate standard of review for denial of post-conviction relief after an evidentiary hearing is the clearly erroneous standard. *Reynolds v. State*, 521 So.2d 914, 918 (Miss. 1988). A finding of fact is "clearly erroneous" when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm

conviction that a mistake has been made. *Bryan v. Holzer*, 589 So.2d 648, 659 (Miss.1991) (citing *UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc*., 525 So.2d 746, 754 (Miss.1987)). "This Court must examine the entire record and accept that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact. *Mullins v. Ratcliff*, 515 So.2d 1183,1189 (Miss.1987) (citing *Cotton v. McConnell*, 435 So.2d 683, 685 (Miss.1983)). And, finally, the trial judge, sitting in a bench trial as the trier of fact, has sole authority for determining credibility of the witnesses. *Mullins v. Ratcliff*; 515 So.2d at 1189 (Miss.1987)(citing *Hall v. State ex rel. Waller*, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963)). This Court must examine assignments of error presented in light of the aforementioned principles.

¶30.  A presumption exists that an attorney's representation was competent, with a strong presumption that the conduct fell within the wide range of professional assistance. *Hiter v. State*, 660 So.2d 961 (Miss. 1995)(citing *Carney v. State*, 525 So.2d 776, 780(Miss. 1988)). Under *Strickland v. Washington,* 466 U.S 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the defendant must first show that counsel's performance was deficient, which requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. The deficiencies of Attorney John Jackson must be measured within the totality of the circumstances. *Hiter*,  660 So.2d, at 965 .

11

¶31. To overcome the presumption that counsel is competent, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Schmitt v. State***, 560 So.2d 148, 154 (Miss. 1990) (*quoting **Strickland***, 466 US at 694). Similarly, according to ***Strickland***, the defendant must show the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. ***Id***. at 687.

### Deficient Performance

¶32. Johns asserts various errors that call into question the competence of his attorney. The burden of proving of these errors rests with Johns. Oliver Johns asserted many errors in his ineffective assistance claim. However, because the law requires that we measure performance within a totality of the circumstances, we will point out the deficiencies of Jackson's performance in their entirety.

¶33. As the facts have shown, Jackson did not do much in the very short time he had to prepare for this trial. The record reveals that he met with Johns four times, and two of those meetings lasted less than forty-five minutes.[2] It is abundantly clear to this Court that the primary purpose of the meetings with his client was not to conduct any pre-trial investigation or preparation, but to obtain cash from the defendant and his family. All but one of these meetings occurred at McDonald's, a public restaurant, without the privacy required to discuss

---

[2]Jackson testified when asked if he met with Johns when his father wasn't with him that he believes he "met him one time somewhere...I know we met at McDonald's a number of times. . . But we met somewhere else, I just can't remember where."

12

with a client a case of this magnitude, let alone to maintain the integrity of the attorney-client privilege.

¶34.    There is absolutely no documentary evidence that Jackson even undertook the minimal task of creating and maintaining a file on Oliver Johns.  He admits that he got discovery from the state, but he never brought it to McDonald's, nor did he ever bring any other sort of paper.  Jackson never showed his client any documents or evidence related to his defense.  Jackson cannot affirmatively state that he showed Johns any documents or even took time to prepare him for the trial.[3]  However, both Johns and his father remember that he did not.  The only documents  Jackson ever had were those other people had given him, discovery from the state and a list of witnesses from Johns.  Jackson even admitted, and the record supports, that he did not file a single pre-trial pleading.

¶35.    The Court of Appeals reasoned that John Jackson's testimony at the evidentiary hearing contradicted many of the assignments of error that Johns alleged;  particularly that Jackson only met with Johns a few times, that Johns never had the opportunity to review the discovery materials, that Jackson never discussed with Johns whether Johns would testify at trial, that Johns did not know when the trial would be held until the evening of the trial, and that Jackson failed to discuss trial strategy with Johns.  *Johns v. State*, 2005 WL 89423, *6

---

[3]Questioning at the evidentiary hearing regarding whether Jackson prepared Johns to testify:

Q.        . . . Based on that, wouldn't you agree that it would be prudent and effective use of your time to always prepare your client to testify. . . .

A.        If you're making the assumption that I did not testify [sic] my client, that might be so, but I always prepare my client to testify. . . .

After stating it might be so that he did not prepare Johns to testify, he stated that he did recall specifically preparing Oliver Johns to testify, but he did not remember when or where.  After that, he stated the following: "One of his parents might have been there, I just don't know.  I just don't know.  But I always do that."

(Miss.App. 2005). The Court of Appeals reasoned that Jackson "refuted each of these allegations, although he was unable to remember many of the details concerning his representation of Johns. The circuit court judge's decision to hold Johns's counsel to be effective was based largely on credibility." Id. at *7.

¶36. We recognize that the trial judge, sitting in a bench trial as the trier of fact, has sole authority for determining credibility of the witnesses. *Mullins*, 515 So.2d at 1189. Jackson's testimony was not reliable. The only fact of which Jackson was certain was that he did not remember. Jackson could provide testimony on his "standard procedure" when preparing for trial, but could hardly provide any specifics as to what he did when preparing for Johns's trial. He testified strictly from his recollection, without the aid of any documents, and stated numerous times that he only vaguely remembered things or that he did not remember things at all. A finding of fact is "clearly erroneous" when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Bryan*, 589 So.2d at, 659 (Miss.,1991) (citing *UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc*., 525 So.2d 746, 754 (Miss.1987)). We have a definite and firm conviction that a mistake has been made and find that the trial court judge's reliance on Jackson's testimony as credible is clearly erroneous.

¶37. The Johns family remembered things very well. Among the list of things they remembered were: each meeting they had with Jackson, giving Jackson the list of alibi witnesses, repeatedly asking Jackson whether he had spoken to the alibi witnesses, statements Jackson made regarding interviewing the witnesses, statements Jackson made regarding

14

evidence that the State had, and when and how much Jackson was paid. The Johns' had much invested in this trial. Oliver Johns, Jr. stood to lose his freedom, and his parents invested time, support and money into this trial. In light of these factors, it is clear they were extremely involved in their son's defense and that their recollection of events was certainly sharper than Jackson's.

¶38. Johns's primary argument was that Jackson failed to interview the alibi witnesses that he provided Jackson before trial, which was, in effect, a claim that Jackson failed to perform the proper pre-trial investigation. "[A]t a minimum, counsel has a duty to interview potential witnesses and to make *independent* investigation of the facts and circumstances of the case." ***Payton v. State***, 708 So.2d 559 (Miss. 1998)(citing ***Ferguson v.*** *State*, 507 So.2d 94, 96, 1987) (emphasis in original). The decision not to interview witnesses, particularly your own, cannot be considered an effective strategic choice. When counsel makes choices of which witnesses to use or not to use, those choices must be based on counsel's proper investigation. Counsel's minimum duty is to interview potential witnesses and make an independent investigation of the facts and circumstances of the case. ***State v. Tokman***, 564 So.2d 1339, 1342; ***Ferguson***, 507 So.2d, 96.

¶39. Jackson did not meet the minimum duty required of him. Both Johns and his father agree Jackson was given the names and addresses of the alibi witnesses and was asked to contact those witnesses. In fact, they made several attempts to press him to do so. Johns testified Jackson told him the witnesses were not important, even though they remembered seeing Johns and his young daughter very close to the time the crime was committed. The

15

Court of Appeals reasoned that "Johns's attorney indicated that he had a very good reason for declining to interview these particular witnesses. . . . he believed the witnesses testimony was perjured testimony, based on the information Johns gave his attorney." *Johns*, 2005 WL 89423 at 5. There is a question as to how Jackson could have believed the witnesses testimony was perjured when he never talked to them, and the only information Johns gave him was the names and addresses.

¶40.    Jackson claims he talked to two people that Johns brought to him, but he could not remember who they were. Neither of the Johns' ever says that they brought any witnesses to Jackson, only that they provided him with the names and addresses. Jackson testified he believed those two people were of no help and were going to provide perjured testimony. Based on that, he did not speak to any more witnesses. Those two witnesses had absolutely nothing to do with the three alibi witnesses. In fact, Jackson was unable to identify those alleged witnesses.[4]

¶41. This case closely resembles *Payton v. State*,708 So 2d 559 (Miss. 1998) In *Payton*, a private investigator was hired to investigate the background of a rape victim, but the attorney himself never talked to her (the victim). *Id.* At 562. He went to the scene of the

---

[4]  The dissent reasons that Johns talked to two of the three alibi witnesses and refused to offer them because he believed they would offer perjured testimony. In the dissent, it is said that "Jackson further testified that he interviewed these people [alibi witnesses] prior to trial." Jackson *never* said that he remembered interviewing either of the alibi witnesses. Even as Jackson sat in the evidentiary hearing, listened to them testify, and looked them in the eye, Jackson still could not testify that he ever spoke to either of those witnesses. He did say that Reginald Nunnery looked familiar to him, but when Johns's counsel pointed out that Nunnery was very good friends with Jackson's brother, Jackson admitted that that may be why Nunnery looked familiar.

16

crime, but did not take any photos. *Id.* He did not do any other investigation because he did not feel it necessary after the investigators had completed their jobs. *Id.* Payton, in his motion for post-conviction relief, asserted that the attorney should have tried to interview people at the scene and people who worked with the victim at her workplace who also had important information. We recognized there was no attempt to take statements from the homeowners at the scene of the incident or from the victim's roommate. This Court reasoned that " such attempt had been made, these people could have been called to testify.... Even after two years of delay between the time of arrest and trial, Payton's attorney failed to conduct a scintilla of discovery other than go to the crime scene one time and request the state to turn over it's discovery." *Id.*

¶42.    Jackson failed to conduct any discovery other than his alleged visit to the crime scene and his request that the state turn over discovery. Assuming Jackson went to the scene, he went on a blind mission, looking for people who looked like they might have known something or seen something. There were homeowners on the street where the shooting occurred. As a matter of fact, some evidence was found in their yards. Jackson did not even talk to them about what they saw. Jackson knew that Johns was going to testify that he was at home with his daughter. That was Johns's sole defense. However, Jackson never did an independent investigation of any area or individuals in relation to the alibi defense. The decision not to use the alibi witnesses was not based on proper investigation; it was not based on any investigation whatsoever. Jackson's minimum duty was to interview potential

17

witnesses and to make an independent investigation of the facts and circumstances of the case. He did neither.

¶43. "There is no question that the defendant is entitled to a basic defense." *Hill v. State*, 850 So.2d 223,266 (Miss.App. 2003) (citing *Triplett v. State*, 666 So.2d 1356 (Miss. 1995)). As to what a basic defense may entail, the language from the *Triplett* Court is instructive:

> Basic defense in this case required complete investigation to ascertain every material fact about this case, favorable and unfavorable. It required familiarity with the scene, and the setting. It required through his own resources and process of the court learning the names of, and interviewing every possible eyewitness, and getting statements from each. It required prior to trial learning all information held by the state available to the defense through pre-trial discovery motions.

*Triplett*, 666 So.2d at 1361. The facts of this case clearly show this basic defense was not provided to Johns.

¶44. According to the dissent, we have failed to address the critical point that the jury did not convict Johns of shooting into a motor vehicle, and he was acquitted on that count. The dissent suggests that because Jackson assisted Johns in an acquittal, he could not have been ineffective. It certainly seems inconsistent that Johns could have been convicted for assault and yet acquitted on the charge of shooting into the vehicle. That would seem to suggest the victim was injured by some means other than a shot being fired into the vehicle. At the trial of this matter, no one testified that Oliver Johns fired any shots. The testimony from each witness was that they did not know nor could they determine who fired the shots. In fact, the police could not even determine that shots were fired from Johns vehicle at all. Jackson could literally have been asleep and still established this point. An equally plausible theory

18

as to why he was convicted is that the evidence was insufficient to support a conviction on either of the two charges, and the jury compromised and convicted him on one of the charges.

¶45.    Johns has met the first requirement of **Strickland**, as he has shown his counsel's performance was deficient and that Jackson was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.

### Prejudice to the Defense

¶46.    To overcome the presumption that counsel is competent, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." **Schmitt**, 560 So.2d at, 154 (Miss. 1990) (*quoting* **Strickland**, 466 US at 694).  To show reasonable probability, the mover must merely show  "a probability sufficient to undermine confidence in the outcome." **Davis v. State**, 743 So.2d 326, 334 (Miss. 1999)(quoting **Mohr v. State**, 584 So.2d 426, 430 (Miss. 1991)).  If Jackson had simply been prepared for the trial; if he had asked for more time to prepare instead of going forward in less than two months; if he had questioned the alibi witnesses that he should have questioned; if he had talked to the mother of Johns's daughter; if he had taken time to prepare his client to testify; if he had done *anything* to help Oliver Johns there is certainly a reasonable probability that the outcome of the proceeding would have been different.

¶47.    Having overcome the presumption of competent counsel, the defendant must now show that the deficient performance prejudiced the defense. This requires showing that

counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 US at 687.

¶48. Failing to find that Jackson's performance was deficient, the court of appeals did not address *Strickland*'s necessary element that the defendant show that Jackson's errors were so serious as to deprive him of a fair trial.

¶49. The testimony at trial showed that the aggravated assault for which Johns was convicted happened some time between 8:00 and 8:30. Reginald Nunnery, one of Johns's neighbors, testified that he saw Johns with his daughter and invited them to a cookout. He asked Johns to go to the convenience store and purchase something for him. Johns walked to the convenience store and returned fifteen to twenty minutes later. Nunnery was sure he saw Johns after 8:00. Reginald Nunnery's wife, Patricia, also testified that she saw Johns between 8:15 and 8:30 p.m. because she noted the time on her watch. Patricia Nunnery saw Johns after he arrived back at her house from the convenience store. Katie Magee, another neighbor, said she saw Johns coming from the direction of the convenience store shortly after 8:00 p.m. She remembered this because they were getting ready to celebrate a friend's birthday that evening. Katie Magee had a conversation that lasted about three or four minutes with Johns, and she did not notice anything unusual about his demeanor or his behavior.

¶50. The trial court found the testimony of these witnesses suspicious based on the amount of time it should have taken the chicken to cook. Further, the trial court reasoned that because the alibi witnesses could not remember specific dates and times of events which

occurred after the night they saw Johns, they must have faulty memories. The question is not whether they could remember when they signed affidavits or when they spoke to attorneys, the question is whether they could remember events that occurred at or about the time of the shooting. Each could remember the date and the times they saw Johns. Each of these witnesses put Oliver Johns in his neighborhood with his young daughter during the time the crime was committed.

¶51. Had the witnesses been asked in October of 1996 if they remembered what happened in March of 1996, then certainly their recollection would have been fresher at that time. The determination to be made is whether these witnesses could have offered reliable testimony at the time they should have been asked.

¶52. The testimony of the alibi witnesses was not rebutted by the prosecution. The prosecution was successful in proving that the memory of the witnesses was faulty when remembering months and years that they spoke to attorneys regarding this incident and in remembering when they signed affidavits. However, at no time did the content of the affidavits come into question; at no time did the veracity of the witnesses come into question; at no time was it established that any of them had motive to do anything other than state the truth. Johns's alibi defense raises an issue of fact to be resolved by the jury. *Hughes v. State*, 724 So.2d 893 (Miss.1998).

¶53. The dissent spends an inordinate amount of time pointing out flaws in the testimony of the alibi witnesses. The problem is not with what the witnesses said or did not say. The problem is that Jackson never talked to them. Johns was entitled to an alibi defense. The

21

jury should have been given an opportunity to hear, assess, and evaluate the testimony of these alibi witnesses. That did not happen because Johns's attorney was ineffective. Again, Johns's alibi defense raises an issue of fact to be resolved by the jury. *Id.*

¶54.    The failure to investigate this case by Jackson prejudiced Oliver Johns. The testimony of the alibi witnesses, coupled with the fact that there was absolutely no physical evidence to convict Johns, could very well have changed the outcome of the trial. Johns has surpassed his obligation under *Strickland* to prove that Jackson's performance, or in this case, Jackson's non-performance prejudiced his defense.

## Conclusion

¶55.    We find the trial court clearly erred in finding that Jackson provided effective assistance to Oliver Johns. There are ample facts to support our conclusion that counsel's performance was deficient and that there is a reasonable probability the outcome of the trial would have been different if some type of pre-trial investigation and preparation had been done. *See Strickland v. Washington*, 466 U.S. 668. Therefore, we reverse the judgments of the Court of Appeals and the Pike County Circuit Court, and we remand for a new trial.

¶56. **REVERSED AND REMANDED.**

   **SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON AND DICKINSON, JJ., CONCUR. RANDOLPH, J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ AND EASLEY, JJ., NOT PARTICIPATING.**

   **RANDOLPH, JUSTICE, DISSENTING:**

I. **This Writ of Certiorari has been improvidently granted**

22

¶57. The decision to review vel non, a decision of the Court of Appeals is controlled by Mississippi Rule of Appellate Procedure 17. M.R.A.P. 17(a) unequivocally declares, "[s]uccessive review of a decision of the Court of Appeals by the Supreme Court will ordinarily be granted only for the purpose of resolving substantial questions of law for general significance." Review will ordinarily be limited to:

> 1) cases in which it appears that the Court of Appeals has rendered a decision which is in conflict with a prior decision of the Court of Appeals or published Supreme Court decision;
> 2) cases in which it appears that the Court of Appeals has not considered a controlling constitutional provision;
> 3) cases which should have been decided by the Supreme Court because:
> > i) the statute or these rules require decision by the Supreme Court, or
> > ii) they involve fundamental issues of broad public importance requiring determination by the Supreme Court.

**M.R.A.P 17 (a)(1)(2)(3)**

¶58. Accordingly, the Court of Appeals decision should be final and non-reviewable. The record before this Court clearly reveals this case fails to meet any of the aforementioned prerequisites, and therefore, this petition fails to satisfy the standard of review required under Mississippi Rule of Appellate Procedure 17(a). Johns was charged with aggravated assault (Count I) and shooting into a motor vehicle (Count II). The jury was unable to reach a verdict on Count II of the indictment, and convicted Johns of Count I only. The verdict of the Pike County Circuit Court was unanimously affirmed on direct appeal by the Court of Appeals. The denial by the trial court of Johns' motion for post-conviction relief was also affirmed by the Court of Appeals without dissent.

23

¶59. The majority fails to address this fatal flaw. The petitioner never sought to establish, and the majority fails to reveal, good cause to suspend the requirements or procedures of these rules. *See* M.R.A.P. 2(c). We are bound to follow our rules, notwithstanding we may disagree with a lower court in the result. This Court should find the Writ of Certiorari was improvidently granted, as the requirement for a review under M.R.A.P 17(a)(1) is nonexistent, and alone should be dispositive.

## II.      Johns' claim is illusory

¶60. Johns asserts his case is analogous to ***Payton v. State,*** 708 So.2d 559 (1998). However, this case is clearly distinguishable from ***Payton.*** As such, the Court of Appeals' decision is not in conflict with ***Payton.*** Payton satisfied the appellate court he was prejudiced due to the lack of *any* pre-trial investigation, based on uncontroverted testimony that *no* pre-trial investigation was conducted. ***Id.*** at 561. In this case, the testimony is in conflict. Johns alleges prior to trial he presented to his attorney, Jackson, the names of three witnesses.  At the post-conviction relief hearing, Jackson testified that he determined the witnesses were not credible and that if he called the witnesses, their testimony could well be perjurous.

## III.     History of the Proceeding

¶61. The victim of an aggravated assault, Kendall Jefferson, testified that in the weeks prior to the shooting, his life had been threatened by Johns.  Jefferson further testified after this incident, he and Johns were involved in a fight.  Johns countered  that he had been threatened by Jefferson.

¶62.   According to Jefferson, prior to the shooting incident, he went to Johns' place of employment to speak to Johns to work out their differences. Jefferson stated that Johns told him, "[w]e ain't leaving nothing alone and tell your grandma she ain't got to worry about keeping you out after you dead. Just tell her you're already dead."

¶63.   On March 28th, the date of the shooting, Jefferson and Johns had encountered each other on two separate occasions, at local convenience stores. One of these convenience stores was B.J.'s, where Jefferson testified he was again threatened by Johns. Johns' alleged witnesses testified at the PCR hearing that Johns went to B.J.'s on the evening of March 28th.

¶64.   Accompanying Jefferson to B.J.'s and witnessing the conversation between Jefferson and Johns was Rushard Haynes. Haynes' testimony conformed with Jefferson's testimony. that at approximately 8:00 p.m., March 28th, Johns, in his vehicle, followed Jefferson's car from B.J.'s and that multiple gun shots[5] were fired from Johns's vehicle at and into Jefferson's vehicle. The victim, Jefferson, and the eyewitness, Haynes, testified conclusively they were certain Johns was the driver of the following vehicle. However, neither Jefferson nor Haynes testified they could be certain Johns fired the shots. A passenger in Jefferson's vehicle was wounded, but he disappeared after the incident and was never found. No weapon was found. The trial court found the state put on a prima facie case Johns' vehicle was the source of the shots.

---

[5]The shots were fired from an AK-47 assault rifle.

25

¶65. At trial, Johns denied he followed Jefferson and further denied anyone from his car fired a shot. Johns testified he was home with his daughter at the time of the shooting.

This conflicting evidence was presented to a Pike County Circuit Court jury, which convicted Johns of aggravated assault, but did not convict Johns of shooting into a motor vehicle. Johns fails to highlight this outcome and the dichotomy it presents when claiming the ineffectiveness of his counsel, who evidently succeeded in convincing a jury Johns was not responsible for firing the actual shots.

¶66. Johns asserted in his PCR his conviction was the result of ineffective assistance of counsel at trial. The burden of proof rests upon Johns. The actions of Johns' attorney must be measured within the totality of the circumstances. See *Strickland v. Washington,* 466 U.S 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

¶67. Johns asserted Jackson was ineffective because he failed to interview his alibi witnesses. Jackson testified he never received an actual list, but that Johns furnished him names of putative alibi witnesses. Jackson further testified he interviewed these people prior to trial. At the PCR hearing, approximately seven years after the trial, he was unable to recall their names. When Jackson interviewed the first witness, prior to trial, Jackson stated this witness told him, "I'm gonna say what you want me to say." When presented with inconsistencies and the offer to manufacture testimony, Jackson was faced with the decision of whether or not to use these witnesses in Johns' trial. Jackson testified after meeting with these people, he determined their testimony "would have essentially been useless." A review of the original trial record, the affidavits of these putative witnesses and their conflicting

26

testimony at the PCR hearing, satisfies this Justice the decision of Jackson was clearly sound trial strategy.

¶68.   Johns' ineffective assistance claim is totally reliant on Jackson's failure to present evidence of an alibi through these putative witnesses. At trial, Johns testified he was at home with his daughter at the time of the shooting; however, his alleged eyewitnesses offer a different and varying version of the events of that evening. Prior to the PCR hearing, Johns' alibi witnesses offered affidavits Johns was not at home with his daughter as he asserted, but rather he was walking around the neighborhood. At the PCR hearing, these putative witnesses testified to the same, which conflicts Johns' testimony.

¶69.   The testimony of the putative witnesses also conflicts with the testimony of Jackson. These putative witnesses claimed they were not contacted by Jackson. Contrastingly, Jackson testified at the PCR hearing that these putative witnesses were going to offer perjured testimony, and that as an officer of the court, he determined they should not called.

¶70.   The majority opinion that Jackson *was* deficient in not calling these witnesses rests upon a conflict in testimony.  The circuit court judge in this matter is in the best position to resolve these conflicts and it is our duty to afford him deference. This Court has held, "a circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." ***Chantey Music Pub., Inc. v. Malaco, Inc.,*** 915 So.2d 1052, 1055 (Miss. 2005) (citations omitted). Assuming the truthfulness of Jackson's testimony, which the trial court and Court of Appeals did, the Rules of

Professional Conduct require the action taken by Jackson. A lawyer may refuse to offer evidence that the lawyer reasonably believes is false. *See* False Evidence Comment to M.R.P.C. 3.3(c).

¶71.   Even if this Court were to ignore this prohibited conduct, and further consider the *Strickland* test, Johns fails the second prong of the test.  Under *Strickland,* in order to show ineffective assistance of counsel, one must also show "that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S at 694.

¶72.   Applying *Strickland* to the case before us, the question becomes: would the result of Johns' trial have been different if Jackson put on the putative alibi witnesses with their varying testimony? Reviewing each putative alibi witness' testimony at the PCR hearing, then comparing the testimony to their affidavits, and finally considering the contrasting trial testimony of the defendant, Johns, leads me to conclude the result of this proceeding would not have been different. In support of this conclusion, pertinent portions of the testimony and affidavit statements of each of the three alleged witnesses is discussed infra.

A.     **Reginald Nunnery**

¶73.   Reginald Nunnery stated he is a "friend" and "used to do work for" Johns. Nunnery did not tell anyone he had information regarding Johns' whereabouts until after Johns had been charged with the crime. Johns' mother allegedly informed Nunnery not only that he was charged with the crime, but also when and where the crime occurred. Upon learning this information, Nunnery did not offer to share the "knowledge" with the police or district

attorney that he had seen Johns at the time the crime occurred at a place other than the crime scene.

¶74. In his affidavit, attached to the PCR, Nunnery claimed he saw Johns in the early evening hours of March 28th, when he told Johns he would be cooking out and invited Johns to dinner. Nunnery claimed Johns arrived at his home "a little bit after eight, about 8:12, 8:15." Nunnery then sent Johns to BJ's store to purchase beer, and Johns was gone fifteen to twenty minutes. Portions of this testimony comport with that of the victim, Jefferson, and the eyewitness, Haynes, who both testified they saw Johns at B.J.'s on March 28th. Nunnery stated at the PCR hearing he "always starts his fire [for grilling] at 8:00," which he repeated a second time, "always at 8:00." Earlier, Nunnery stated that around 8:15 p.m., he was "busy with my fire, getting it started for my grill." Nunnery swore in his affidavit, that the food would be ready at 9:30 p.m. at the latest.

## B. Patricia Nunnery

¶75. Patricia Nunnery, Ronald Nunnery's wife, asserted that Johns walked into her backyard at 8:15 p.m. and that the purpose of Johns's visit was to ask her husband to do some work on Johns's wife's car. Patricia stated that Johns's visit took place between 8:15 and 8:30 p.m., "the time when we just got through, about to get through with the food on the grill." She also stated Johns went to B.J.'s, but he "wasn't even gone ten, fifteen minutes."

¶76. Contrary to her husband, Patricia stated twice during testimony she was certain the food was through cooking around 8:15 p.m., because she *specifically* looked at her watch. Patricia should have been aware her husband *always* started his grill at 8:00 p.m. She also

stated her husband slow cooked the food, which takes "about an hour, hour and a half," and the food had been on the grill at least an hour before she spoke with Johns, as the food was finished cooking when Johns came to their house.

## C.     Katie Magee

¶77.    Katie Magee stated she and Johns' father were raised together and she has known him all her life. In her affidavit, Magee stated she grew up in the same neighborhood as Johns and they were friendly. Magee stated no one contacted her during the course of Johns' trial. Magee claimed the first time she was aware that she had information which was helpful to Johns was when she was discussing Johns' conviction with his father.  Magee did not come forward with this story until after she was contacted by Johns' appeal attorney, but she could not recall when she met this attorney.

¶78.    At the PCR hearing, Magee stated she saw Johns walk by her backyard with his daughter "a little after eight" and that she talked to him for "3 or 4 minutes," and she was "sure" about this time. However, in her affidavit, Magee asserted she first saw Johns "around 8:30 p.m." and spoke with him for "several minutes." Contrary to the testimony she had given moments before, and contrary to her affidavit,  Magee then stated that when she heard from Johns's father about the time the crime took place, she saw Johns hanging around the Nunnery's "all that evening and toward the night."

¶79.    The majority opinion relies on Magee being able to remember the exact date and time, as she was celebrating the birthday of a friend in her backyard. The crime took place on March 28th. At the PCR hearing, Magee stated her friend's birthday was on March 27th.

Realizing the contradiction from her own testimony moments before, she then recanted and said there was no birthday party. She then stated she remembered, from approximately seven years before, that on the 28th of March, she just had people over to "hang out." Magee admitted she had been drinking the day of March 28th.

¶80. The witnesses presented inconsistent statements regarding the time they saw Johns. Each witness's testimony at the evidentiary hearing conflicts not only with their personal affidavits, but with the testimony of each other and most importantly, with Johns's testimony. Each witness stated Johns was at their home the night of March 28th, at the time of the shooting. Johns told the jury he was home with his daughter the entire evening.

¶81. According to *Strickland*, "a convicted defendant … must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. Jackson made the professional determination these witnesses would not be credible; therefore, Jackson did not call them as alibi witnesses. Johns states that under *Strickland*, counsel has a duty to make reasonable investigation. Jackson testified at the evidentiary hearing he made the determination prior to trial these witnesses may offer perjured testimony. Under *Strickland*, counsel has the right to make decisions regarding trial strategy. *Id.* at 688-89. Jackson's choice not to call witnesses lacking credibility and offering testtimony inconsistent with the accused's testimony can clearly be considered trial strategy.

Assuming arguendo Jackson called the witnesses with their inconsistent testimony, due to the overwhelming weight of other evidence presented against Johns, a reasonable juror

31

could have reached a guilty verdict. There has been no showing the outcome of Johns's case would have been different had these witnesses testified.

¶82.    This case was decided by a jury, and this Court gives jury verdicts great deference. *Venton v. Beckman,* 845 So.2d 676, 686 (Miss. 2003) (citing *Ducker v. Moore,* 680 So.2d 808, 811 (Miss. 1996)). This case was subsequently affirmed by a unanimous Court of Appeals. Johns's motion for post-conviction relief was denied by the trial court after a full hearing.  This decision was affirmed by the Court of Appeals without dissent. It is the duty of this Court to give deference to these decisions and this conviction should not be disturbed.

¶83.    Johns has clearly not proved an ineffective assistance of counsel claim under *Strickland*.  Jackson testified in an evidentiary hearing that in his professional judgment, he believed Johns's alibi witnesses were going to offer false statements. Jackson took into account the surrounding circumstances and made a tactical decision not to call these witnesses.

¶84.    Johns further failed to prove Jackson's defense prejudiced the outcome of his case. The overwhelming weight of evidence presented against Johns would allow a jury to reasonably conclude that Johns was guilty of the crime committed. Even if these alleged alibi witnesses had testified, a different result would not have occurred.

¶85.    For these reasons, I respectfully dissent.