# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-00903-SCT

*DAVID MARTIN ROBERT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 5/4/2000 |
| TRIAL JUDGE: | HON. LARRY EUGENE ROBERTS |
| COURT FROM WHICH APPEALED: | KEMPER COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES A. WILLIAMS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEAN SMITH VAUGHAN |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED-3/21/2002 |
| MOTION FOR REHEARING FILED: | 5/1/2002; denied 7/25/2002 |
| MANDATE ISSUED: | 8/1/2002; amended and paragraph 26 of opinion corrected 8/29/2002 |

**BEFORE McRAE, P.J., EASLEY AND GRAVES, JJ.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1. David Martin Robert ("Robert") was indicted, tried, and convicted for the murder of Lakel Cross ("Cross") in the Circuit Court of Kemper County pursuant to Miss. Code Ann. § 97-3-19(1)(b) (2000) and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. On appeal Robert claims that he was denied a fair trial because a defense witness was improperly impeached, a witness for the prosecution was improperly impeached, the evidence raised a reasonable doubt whether Robert fired the fatal shots, and the trial court refused to poll the jurors individually upon his request. We find that Robert was not denied a fair trial and that any errors committed were harmless. Therefore, we affirm the judgment of the trial court.

## FACTS

¶2. On March 25, 1999, Robert, Anthony Rhone, and William Glass drove from Meridian to Kemper County to a night club called "The Other Side of Midnight." Robert's wife, Mary Ann, and her friend Charlotte Curtis drove to the club separately. While at the club, Glass and Cross got into a fight on the

dance floor. Mary Ann and Curtis were outside when the fighting ensued. Robert and Rhone stood at the edge of the dance floor with their backs turned while Glass and Cross fought. Someone turned the lights on and off during the fight while many patrons were exiting the building. The lights went out a final time, and gun shots were heard and seen by different witnesses. Cross was shot five or six times and died as a result. Several witnesses said that shots were fired outside the club also. Testimony differed as to how many shots were fired and their origin.

¶3. Robert admitted that he pulled from the front of his pants a Lorson 9 mm pistol, which had a ten round clip in it, and began shooting. He told law enforcement officers that he shot toward the ground. Robert said he did not see Cross on the floor and did not know until later that Cross had been shot. He stated that once he got outside, Glass and Rhone were already in car, so Robert got in the car with his wife and Curtis and left.

¶4. At one point, Robert told law enforcement officers that he thought he shot his gun four times but that he did not think he shot Cross. Later, he said that he did not know how many shots he fired. At the motion to suppress hearing, Robert said he shot his gun toward the ceiling and toward the ground. In a tape-recorded statement to police, Robert said he told his wife in the car that night that he thought he shot Cross. Robert told law enforcement officers that a day or two after the incident he gave his gun to Al Ott to "put it up" and has not seen it since that time.

¶5. Rhone testified that he saw a total of eight to ten gunshots coming from both sides of the club. Contrary to Robert's statement, Rhone testified that when he got outside after the shooting, Robert and Glass were already getting in the car, a Mazda Protege. Rhone said he did not hear anything after the shooting from Robert that would link Robert to the shots fired in the club.

¶6. Debra Boyd testified that she was standing behind the bar in the club and that she went to the front of the dance floor once the fighting began. Boyd said there were two or three guys fighting and that she saw more than five or six shots coming from one direction.

¶7. Curtis testified that Robert, Rhone and Glass all came outside to the Mazda Protege before she heard gunshots. She said Robert got a black gun from the trunk of the car, and then the guys went back inside. Curtis was the only witness to testify seeing Robert with a gun. She said she heard two shots outside also and that Mary Ann started the car and was leaving when Robert got out of the car with Rhone and Glass and got in the car with them. Curtis heard Robert tell Mary Ann that Glass beat up Cross. She also said Robert bragged about shooting Cross and said his gun held ten bullets but there were none left. She never heard Robert state the number of times he shot Cross.

¶8. Cross went to the club with Hill the night he was killed. Hill testified that the two had been together since the night before and neither of them had a firearm or weapon of any kind nor did they plan to fight anyone. Hill saw two males fighting but did not know that Cross was one of them. The third time the lights went out, Hill heard a gunshot and could see fire from the bullet. He said he heard four gunshots inside and they were aimed downward and that he heard shots outside too. Hill went back inside after the shooting ceased to find Cross lying on the floor with two nurses trying to revive him. On cross-examination, Hill admitted to telling police officers in an interview that he heard five or six shots inside the club and two or three outside.

**DISCUSSION**

## I. WHETHER RHONE WAS IMPROPERLY IMPEACHED THEREFORE DENYING ROBERT A FAIR TRIAL AND THE RIGHT TO CONFRONT WITNESSES AGAINST HIM

¶9. Anthony Rhone accompanied Robert and Glass to the club the night Cross was killed. Rhone testified for the defense as an eyewitness. On cross-examination, the District Attorney asked Rhone if he had ever been convicted of the crime of dishonesty. After defense counsel's objection as improper predicate was overruled, Rhone replied that he had a felony charge. The District Attorney then said, "Right, and that was for stealing what, a necklace off a girl's neck?" Rhone was quick to correct the District Attorney in his response. "It wasn't off a girl's neck, and I didn't actually steal it. I was with someone who stole it. . ." Defense counsel objected, but when asked by the judge if he was objecting under *Peterson*, he simply replied, "I object to the details of this crime." The District Attorney said he would move on to something else, but defense counsel moved for a mistrial.

¶10. The judge then excused the jury, and the parties established that the conviction was five (5) days short of being ten (10) years old. Also, they established that the conviction was for grand larceny, not robbery. Defense counsel then stated to the court that it was improper for the details of the conviction to be given to the jury. The judge agreed, sustained the objection, and when the jury came back, instructed them to disregard any comments concerning the nature of the offense.

¶11. Robert asserts on appeal that he should have been given notice of the felony conviction before Rhone was questioned on the witness stand. He argues further that the *Peterson* factors were misapplied. *See Peterson v. State*, 518 So.2d 632 (Miss. 1987). Robert complains that the court erred in concluding that grand larceny is a crime of dishonesty. Finally, he renews his argument on appeal that it was reversible error for the District Attorney to go into the details of the crime.

¶12. As to giving notice of felony convictions of a witness, our Rules of Evidence are clear. Rule 609(b) says evidence of a conviction more than ten years old requires notice to the opponent. Miss. R. Evid. 609(b). Rhone's felony conviction was not more than 10 years old; it was five days shy of being 10 years old. Therefore, the District Attorney was not required to give Robert notice.

¶13. Also, Rule 609(a) states that evidence of a conviction may be used to attack the credibility of a witness "if the crime (1) was punishable by death or imprisonment in excess of one year . . . and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect on a party or (2) involved dishonesty or false statement, regardless of the punishment." Miss. R. Evid. 609(a). The judge never concluded that grand larceny is a crime of dishonesty as Robert asserts. The judge said, "if it's for impeachment purposes, the issue is whether he has (sic) ever been convicted of a felony crime. It's matter of law as to whether it's a crime of dishonesty." The District Attorney's statement regarding a crime of dishonesty was included in the statements the judge told the jury to disregard. The trial judge was correct in that it was enough that the conviction was a "felony punishable by death or imprisonment in excess of one year." The issue of whether the crime was one of dishonesty is a question of law, not a question of fact for the jury to decide. Further, the judge admonished the jury to disregard the question and answer which implied that grand larceny is a crime of dishonesty. The jury was also admonished as to the details of the crime. We have held that "it must be presumed that the jurors followed the court's admonition to disregard [any] unanticipated, unprovoked incident and to decide the case solely on the evidence presented; to presume otherwise would be to render the jury system inoperable." *Bell v. State,* 631 So.2d 817, 820

(Miss. 1994) (citations omitted).

¶14. Furthermore, the trial judge properly applied the *Peterson* balancing test. *Peterson*, 518 So.2d at 636. *Peterson* requires the trial judge to consider the following on the record: the impeachment value of the prior crime, the point in time of the conviction and the witness's subsequent history; the similarity between the past crime and the charged crime; the importance of the defendant's testimony, and the centrality of the credibility issue. *Peterson,* 518 So.2d at 636.

¶15. The only issue, sub judice, as regards the *Peterson* analysis is whether the judge applied the test at the proper time. We held that "Rule 609(a)(1) requires the trial judge to make an on-the-record determination that the probative value of the prior conviction outweighs its prejudicial effect before admitting any evidence of a prior conviction." *Id.* It was error for the trial judge not to apply the *Peterson* analysis before evidence of the conviction was admitted. As soon as the District Attorney asked the question, the judge should have stopped the proceedings to conduct a *Peterson* analysis. While error, it is not a reversible error since the test was properly applied, on the record, and the court concluded that the evidence of Rhone's conviction had more probative value than unfair prejudicial effect.

¶16. Finally, Robert's contention that his right to confront the witness was compromised is without merit. Rhone was Robert's witness, and he had the right to, and did, ask questions of him. The State had a right to impeach Rhone on cross-examination.

## II. WHETHER ROBERT WAS DENIED A FAIR TRIAL BECAUSE WITNESS SANDERS RUFFIN WAS ALLEGEDLY IMPROPERLY IMPEACHED

¶17. The State called Sanders Ruffin as a witness. Before Ruffin was sworn in, he invoked his right to remain silent pursuant to the Fifth Amendment. Once on the stand, Ruffin stated his name and answered in the affirmative that he was incarcerated at the time, serving two 15-year sentences consecutively. When asked what he knew about the events that transpired the night Cross was killed, Ruffin again pled the Fifth Amendment. The judge then honored Ruffin's constitutional rights and asked defense counsel if he wanted to cross-examine Ruffin. Defense counsel declined to cross-examine him.

¶18. Robert argues that the District Attorney improperly impeached Ruffin by prior conviction because of the reference to the length of the sentences and that the district attorney violated the rule that a witness that has invoked the Fifth Amendment cannot be impeached. Further, Robert argues that the District Attorney prejudiced him by further impeaching Ruffin with the specific questions asked. Robert claims that Ruffin's response that he did not want to testify raised the inference to the jury that Ruffin did not want to testify against Robert. He also argues that since Ruffin did not want to testify bolstered the testimony of witnesses who testified against Robert. This assignment is without merit, but more importantly, it is procedurally barred. "[A] trial court is not put in error unless it had an opportunity to pass on the question." *Oates v. State*, 421 So.2d 1025, 1030 (Miss. 1982) (citations omitted).

## III. WHETHER THE EVIDENCE RAISES A REASONABLE DOUBT WHETHER ROBERT FIRED THE FATAL SHOTS AND THEREFORE DENIES ROBERT A FAIR TRIAL

¶19. Robert claims that the verdict was not supported by the evidence and that a reasonable doubt was raised. He claims that the trial judge wrongfully denied his motion for a new trial. Specifically, he says that

the testimony of Debra Boyd implicated Glass as the shooter; Danny Knight was basically trying to trick Robert in his statement into confessing he shot Cross four times; and had Rhone not been improperly impeached the verdict would have been not guilty or at least resulted in a hung jury.

¶20. The jury determines matters concerning the weight and credibility of the evidence. *See **King v. State***, 798 So.2d 1258, 1262 (Miss. 2001). We have already discussed the impeachment of Rhone and have found no reversible error. The credibility of the testimony of the witnesses, Boyd and Knight, was for the jury to determine, as was Robert's statement to law enforcement.

¶21. To determine whether a jury verdict is against the overwhelming weight of the evidence, we "must accept as true the evidence which supports the verdict and will reverse only when [] convinced that the circuit court has abused its discretion in failing to grant a new trial." ***McDowell v. State***, 2001 WL 1336451, at *8 (Miss. 2001) (citing ***Isaac v. State***, 645 So.2d 903, 907 (Miss.1994)). We see no basis for doubting the verdict. Therefore, the trial judge did not abuse his discretion when he denied the motion for a new trial.

### IV. WHETHER ROBERT WAS DENIED A FAIR TRIAL BECAUSE THE TRIAL COURT REFUSED TO POLL THE JURORS INDIVIDUALLY UPON HIS REQUEST

¶22. Robert claims he was denied a fair trial because his attorney requested individual polling of the jury as to the verdict, and the trial judge denied the request. Before the jury returned to the courtroom after reaching a verdict, the judge said to the parties, "[m]y intent is to bring them back here into the jury box, accept the verdict and make sure it is unanimous by polling the Jury, and if it is, then discharge the jurors." Defense counsel then expressed his preference that the jurors be polled individually and not as a group, but the judge interrupted him and stated the court's procedure:

> Our procedure is to ask each of them to raise their hands if it is in fact their verdict. I'll have them do that and hold their hands up, and I'll give you lawyers opportunity to personally verify that it is the unanimous verdict of all 12. I don't necessarily care about calling them out name by name.

¶23. Once the jury returned to the courtroom and delivered the verdict, the judge asked the jurors to raise their hands if the verdict read was in fact their verdict. All twelve jurors raised their hands, and the judge asked that it be put in the record that it was "a unanimous verdict of all 12 jurors. . . ." Defense counsel then stated to the judge, "I thought you said that we could ask each one of them." The judge replied, "[n]o, sir, I said earlier on the record that I would ask them all to raise their hands. If you would like me to do it again, I would be happy to do that. I counted 12 hands held high. . . ." The judge then asked the jurors to raise their hands again, which they did, and asked both sides if they had any questions. Neither side had questions, and so the jurors were excused.

¶24. In support of his contention that the judge improperly refused to poll the jurors individually and therefore denied him a fair trial, Robert cites ***Edwards v. State***, 615 So.2d 590 (Miss. 1993), arguing that it is implicit that each member should be polled individually when requested. However, in ***Edwards***, the issue was directed at the timing of the polling. There was no discussion as to what constitutes proper polling. There, the jury was polled individually as soon as requested, but the request was not made until after sentencing which the defendant argued "deprived him of any 'meaningful' right or opportunity to poll the jury."***Edwards,*** 615 So.2d at 599. We have recognized that the purpose of polling a jury is

to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented

*Id.* (citing *Miranda v. United States*, 255 F.2d 9, 17 (1st Cir. 1958)). The right to poll the jury is explicit in Rule 3.10 of the Uniform Rules of Circuit and County Court. Rule 3.10 specifically provides that after the verdict is read in open court in the presence of the jury, "[t]he court shall inquire if either party desires to poll the jury, or the court may on its own motion poll the jury." URCCC 3.10. *See also* **State v. Taylor**, 544 So.2d 1387, 1389 (Miss.1989). Further, [i]f the court . . . polls the jury, each juror shall be asked by the court if the verdict rendered is that juror's verdict." *Id.* We rejected Edwards's argument because the jurors were in fact polled individually upon request, and no prejudice was shown as to the timing of the poll. Here, to make the record clear, it would have been better to put the individual responses on the record. Even though the better method was not used, the error is harmless at best in this case.

## CONCLUSION

¶25. We find Robert was not denied a fair trial and that any errors committed by the trial court were harmless at best. Therefore, we affirm the judgment of the trial court.

¶26. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND TO PAY COSTS OF $243.00, AFFIRMED.**

**PITTMAN, C.J., SMITH, P.J., WALLER, COBB, DIAZ, EASLEY, CARLSON AND GRAVES, JJ., CONCUR.**