BARNES, J.,
 

 for the Court:
 

 MODIFIED OPINION ON MOTION FOR REHEARING
 

 ¶ 1. The motion for rehearing is denied. The original opinion is withdrawn, and this opinion is substituted therefor.
 

 ¶ 2. A jury in the Circuit Court of Kem-per County convicted David Martin Robert of depraved-heart murder. He was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. After Robert lost his direct appeal,
 
 [1]
 
 the Mississippi Supreme Court granted his application for leave to seek post-conviction relief on the sole issue of ineffective assistance of counsel. Robert timely filed a motion for post-conviction relief in the Kemper County Circuit Court, attacking his conviction and sentence based upon his trial counsel’s admitted incompetence. An evidentiary hearing was held on the merits
 
 *1236
 
 of Robert’s post-conviction relief claim for ineffective assistance of counsel. The trial court, in a fifty-two page opinion, denied Robert’s motion for post-conviction relief. Robert timely appealed. Finding no error in the circuit court’s decision, we affirm.
 

 STATEMENT OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 3. This case arose from a shooting that occurred in March 1999 at “The Other Side of Midnight,” a nightclub in rural Kemper County that left Lakel Cross dead. That evening, Robert, Anthony Rhone, and William Glass drove from Meridian to the club. Robert’s wife, Mary Ann, and her friend, Charlotte Curtis, drove to the club in a separate vehicle. Witnesses said the club was “packed” that evening. A fight broke out on the dance floor between Cross and Glass, with Robert and Rhone very close to the fight. Mary Ann and Charlotte were outside at the time. Someone turned the lights off and on in the club, signaling a fight was occurring, and the patrons exited the building. When the lights went out the final time, several witnesses heard and saw gunshots. Cross was shot five or six times. Testimony differs as to the timing, location, and number of shots fired. Robert claimed that he left the scene with his wife and Charlotte; Rhone and Glass were in a different vehicle.
 

 ¶ 4. During the murder investigation, Robert admitted in a statement to law enforcement that during the fight he had fired a nine millimeter pistol with a ten round clip loaded with “Black Talon” bullets. Robert’s statement, however, conflicted as to where he shot this gun and how many times. At one point, Robert told law enforcement he shot toward the ground, near Cross, and at another point, he stated he shot at the ceiling and the ground. At one time, he stated he shot his gun four times, but later he said he could not remember how many times he fired the gun. Initially, Robert told law enforcement officers he did not think he had shot Cross, but subsequently, in a tape-recorded statement to police, he stated he had told his wife, upon leaving the club, that he thought he had shot Cross. Robert also admitted he gave his gun to an individual to “put up” a few days after the shooting, and it was never located. Robert’s tape-recorded interview to law enforcement was transcribed into a seventeen-page statement, which was entered into evidence at trial. The murder investigation later revealed a possible motive for the crime: Cross had “snitched” on Glass to law enforcement authorities about a robbery of a Meridian clothing store in which Cross was also involved; Glass and Robert were friends. Also, Cross and Robert were allegedly in rival gangs.
 

 ¶ 5. In January 19, 2000, Robert was indicted for Cross’s murder. Robert was represented by court-appointed attorney James A. Williams. Robert’s trial commenced in May 2000. At trial, no witnesses definitely stated Robert had committed the crime; so Williams was hopeful for his client’s acquittal. Rhone testified, contrary to Robert’s statement, that Robert and Glass were already in a vehicle once Rhone exited the club after the shooting. Rhone claimed to have seen multiple gunshots coming from different areas of the club, but he could not identify a shooter. Debra Boyd testified that she saw two or three men fighting and five or six shots fired from one direction. In earlier statements to law enforcement Debra had implicated Sanders Ruffin as the shooter, who was also at the club that night.
 
 [2]
 
 At
 
 *1237
 
 trial, however, Debra could not identify a shooter. Charlotte was the only witness to testify that she definitively saw Robert with a gun that evening. Before she heard gunshots inside, Robert, Rhone, and Glass came outside to a vehicle. She said Robert retrieved a black gun from the trunk of the vehicle and went back inside the club. Charlotte heard more than two shots inside the club, and two shots outside, as well. When she and Mary Ann were leaving, Robert got out of the car with Rhone and Glass and got into Mary Ann’s vehicle. Charlotte then heard Robert tell Mary Ann that Glass had beat up Cross. She testified that Robert also bragged to Mary Ann about shooting Cross, and that his gun held ten bullets, but there were none left. Tyrone Hill, a friend of the victim, was also at the club that night. He testified that neither he nor Cross had a firearm or weapon that evening, and that they had no intention of fighting anyone at the club. Hill saw two men fighting but could not identify them. The last time the lights went out, Hill heard gunshots and saw the fire of the bullets moving down to the floor. He testified he heard four gunshots inside and additional gunshots outside, but he could not identify any of the shooters. When he went back in the club, he saw Cross lying on the floor where two nurses were trying to revive him. On cross-examination, Hill stated he heard more than three shots — either four, five, or six shots inside, and two or three shots outside.
 

 ¶ 6. Williams remained Robert’s counsel through his direct appeal. Williams did not raise his own ineffective assistance on direct appeal. Williams did, however, attach an affidavit to Robert’s application for leave to file a motion for post-conviction relief with the supreme court, listing in detail numerous instances wherein he found his representation of Robert ineffective.
 

 ¶ 7. Additionally, we note that Robert’s motion for leave to file a motion for post-conviction relief, and the motion itself, were entitled “pro se.” At the post-conviction relief evidentiary hearing in June 2006, Williams admitted to drafting the “pro se” documents for Robert. A memo, entered into evidence at the hearing, written by Williams to Robert’s family, quoted a fee of $20,000 to file the motion for post-conviction relief in the supreme court and for filing a petition for federal habeas corpus relief. The fee originally was to be split between Williams and another lawyer. Williams testified he was paid $5,000 by Robert’s uncle for drafting the post-conviction relief motion, but he returned the money. Evidence of these transactions were entered at the hearing.
 
 [3]
 
 Williams denied committing a fraud upon the court by intentionally failing to raise certain issues on direct appeal. The circuit court took “judicial notice that the pleadings on file in this case were prepared by Honorable James A. Williams in direct conflict with his position as a competent and able attorney.”
 

 ¶ 8. Robert’s current attorney, J. Stewart Parrish, filed an entry of appearance in the circuit court on March 16, 2006, after the motion for post-conviction relief was filed, but before its evidentiary hearing. At the hearing, Parrish called and examined only one individual, Williams, who testified as an adverse witness concerning his performance and ineffectiveness. In finding that Williams provided competent counsel and in denying Robert’s motion for post-conviction relief, the circuit court relied on Williams’s testimony presented at the hearing. Robert raises one issue be
 
 *1238
 
 fore this Court: ineffective assistance of counsel by Williams.
 
 [4]
 

 STANDARD OF REVIEW
 

 ¶ 9. This Court will not disturb the trial court’s factual findings in denying a motion for post-conviction relief unless those findings are “clearly erroneous.”
 
 Brown v. State,
 
 731 So.2d 595, 598 (¶ 6) (Miss.1999) (citing
 
 Bank of Miss. v. S. Mem’l Park, Inc.,
 
 677 So.2d 186, 191 (Miss.1996)). This Court “must examine the entire record and accept ‘that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court’s findings of fact....’”
 
 Loden v. State,
 
 971 So.2d 548, 572-73 (¶ 59) (Miss.2007) (quoting
 
 Mullins v. Ratcliff, 515
 
 So.2d 1183, 1189 (Miss.1987)). Deference to the circuit judge will be given as the “sole authority for determining credibility of the witnesses.”
 
 Id.
 
 (quoting
 
 Mullins,
 
 515 So.2d at 1189). Only when the appellate court has a strong conviction that a mistake has been made will it reverse the findings of the trial court.
 
 Johns v. State,
 
 926 So.2d 188, 194 (¶ 29) (Miss.2006) (citing
 
 Bryan v. Holzer,
 
 589 So.2d 648, 659 (Miss.1991)). Questions of law are reviewed de novo.
 
 Brown,
 
 731 So.2d at 598 (¶ 6) (citing
 
 Bank of Miss.,
 
 677 So.2d at 191). Robert’s burden of proof at the evidentiary hearing in the circuit court was by a preponderance of evidence. Miss.Code Ann. § 99-39-23(7) (Rev. 2000).
 

 ANALYSIS
 

 ¶ 10. The touchstone for ineffective assistance is “whether counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.”
 
 Strickland v. Washington,
 
 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 
 Strickland’s
 
 two-part test must be satisfied for ineffective assistance of counsel; the defendant must show that: (1) his counsel’s performance was deficient, and (2) the deficiency prejudiced the defense.
 
 Irby v. State,
 
 893 So.2d 1042, 1048 (¶ 25) (Miss.2004) (citing Carr
 
 v. State, 873
 
 So.2d
 
 991, 1003
 
 (1127) (Miss.2004)). There is a presumption that an attorney’s performance is competent, “with a strong presumption that the conduct fell within the wide range of professional assistance.”
 
 Johns,
 
 926 So.2d at 194 (¶ 30) (citing
 
 Hiter v. State,
 
 660 So.2d 961, 965 (Miss.1995)). The
 
 Strickland
 
 standard demands a showing that counsel’s errors were so serious that they deprived the defendant of a fair trial.
 
 Id.
 
 at 195 (¶ 31). The deficiency and prejudice are measured by looking at the totality of the circumstances.
 
 Hiter,
 
 660 So.2d at 965 (citing
 
 *1239
 

 Carney v. State,
 
 525 So.2d 776, 780 (Miss.1988)). In order to overcome the presumption of competence, “the defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.”
 
 Johns,
 
 926 So.2d at 195 (¶ 31) (citing
 
 Schmitt v. State,
 
 560 So.2d 148, 154 (Miss.1990)).
 

 ¶ 11. The defendant is not entitled to representation without mistakes, but competent representation.
 
 Mohr v. State,
 
 584 So.2d 426, 430 (Miss.1991). “Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction.... ”
 
 Lambert v. State,
 
 462 So.2d 308, 316 (Miss.1984) (quoting
 
 Strickland,
 
 466 U.S. at 689, 104 S.Ct. 2052). Further, the United States Supreme Court has stated that, in adjudicating a claim of actual ineffectiveness of counsel, the rules are not mechanical, and the adjudicating court does not need:
 

 to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel’s performance was deficient before examining the prejudice.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.
 

 Strickland,
 
 466 U.S. at 697, 104 S.Ct. 2052.
 

 ¶ 12. The circuit court, after careful examination of the trial and post-conviction relief transcripts, enumerated the errors elicited from Williams at the evidentiary hearing in its detailed fifty-two page opinion. It was noted that at the evidentiary hearing, Robert did not stand up and affirmatively plead not guilty. Robert did not testify that his attorney was incompetent. There was no testimony that anybody but Robert committed the offense, and no one else confessed to the murder. The circuit judge found that the alleged deficiencies were mainly trial tactics and concluded that he was not convinced that, but for the alleged deficiencies, the outcome of the trial would have been different.
 

 ¶ 13. On appeal, Robert maintains Williams’s representation of him was deficient and prejudiced the outcome of the trial. We are mindful that these alleged errors must be measured within the totality of the circumstances as to whether they prejudiced Robert.
 
 See Hiter,
 
 660 So.2d at 965. We shall discuss the deficiencies and prejudices Robert raises on appeal in turn.
 
 [5]
 

 1. Witnesses
 

 ¶ 14. Robert argues Williams’s performance was deficient for either failing to subpoena, call, or adequately examine several witnesses at trial whom Robert claims would have placed a reasonable doubt into the jurors’ minds as to whether Robert shot and killed Cross.
 

 ¶ 15. First, Robert claims Williams’s performance was deficient for failing to request a continuance so that eyewitness Cedric Boyd could be located, served a subpoena, and testify at trial. Robert claims Cedric would have testified that someone other than Robert shot Cross; thus, the jury would not have convicted Robert for the crime. Robert further argues that even if Cedric were unavailable, Williams should have filed a notice of intent to use a prior statement by an unavailable declarant, pursuant to
 
 *1240
 
 Mississippi Rules of Evidence 804(b)(5), the general hearsay exception, in order to have Cedric’s identification of a different shooter other than Robert admitted into evidence.
 

 ¶ 16. At the post-conviction relief evi-dentiary hearing, Williams testified he did issue a subpoena on April 21, 2000, for Cedric to appear at trial, but it was never served, as Williams learned that Cedric was in the military and stationed in Germany. In Cedric’s statement to Deputy Milton Orr in April 1999, which is a part of Robert’s record of his motion for post-conviction relief proceedings before the circuit court, Cedric stated he was at the club during the shooting, and had been shown a photographic lineup of four individuals, including Robert, as well as Glass and Ruffin, the unindicted co-conspirators. Cedric identified Glass as Cross’s shooter in this statement to law enforcement. Additionally, the night of the incident, Cedric gave another statement to law enforcement — that a man with “Don King hair,” or “wild hair,” shot Cross. However, Williams said, at the evidentiary hearing, to his knowledge Robert did not have wild hair at the time in question.
 

 ¶ 17. Robert also complains that Debra, Cedric’s mother, who was a disinterested bystander at the club on the evening of the shooting, was not thoroughly examined by Williams at trial. Debra, in her statement to Deputy Orr which was taken in April 1999, stated she was behind the bar when the fighting started on the dance floor and the shots were fired. Debra had previously given a statement to law enforcement identifying Ruffin from photographs as the shooter, but at trial, she was unwilling to specifically identify a shooter. Robert claims Williams should have raised Debra’s prior inconsistent statement during his examination of her— that she had identified a shooter other than Robert — and then the jury would not have convicted Robert.
 

 ¶ 18. Robert does not meet his burden of proof in explaining how calling Cedric to testify or further examining Debra would have changed the outcome of the trial. Since Cedric and Debra were not called to testify at the post-conviction relief eviden-tiary hearing, neither Robert nor this Court can speculate as to exactly what their testimonies would have been. On the stand, Cedric may have changed his testimony from his prior statement, and it may not have been favorable to Robert. At trial, while Debra was not examined about her prior statement identifying Ruffin as the shooter, Williams did have her silently reread the statement she made to the police to refresh her memory. Then, when Williams asked her which male she had described in her statement shot Cross, she responded, “I didn’t really see the person that shot [Cross].” She added that: several men were fighting with chairs; the lights went out; and over six gunshots were fired. When Williams asked if she could identify anybody in the courtroom as the person whom she thought may have had either a gun or a flashlight in his hand, Debra could not. At this time Rhone and Robert were in the courtroom. Williams later admitted that he did not press Debra on identifying a shooter because he thought it sufficient that she did not identify Robert as the shooter. We agree with the trial court that Williams’s decision not to examine Debra about her previous identification of another shooter was trial strategy.
 

 ¶ 19. Second, Robert claims Williams’s cross-examination of the State’s witness, Charlotte, was deficient, and that her testimony should have been impeached by calling another witness. Charlotte, who is a friend of Robert’s wife, Mary Ann, rode with Mary Ann to the club. Char
 
 *1241
 
 lotte gave incriminating testimony on the stand, stating that before the shooting, she saw Robert, Rhone, and Glass come outside the club to a parked vehicle. Charlotte saw Robert retrieve a black gun from the trunk and heard him say he was going to “close the club down” because Cross “told something on them.” Five minutes later, Charlotte heard numerous shots fired inside the club and saw people exiting it. Robert, who at that point was in a different vehicle that was blocked in, got out of that vehicle and got into his wife’s vehicle, which could exit the parking lot faster. When they were leaving the club, Robert bragged about shooting Cross, and he boasted that his gun held ten bullets, but they were all gone.
 

 ¶ 20. At the post-conviction relief hearing, however, Robert’s counsel brought out that there was a conflicting statement from Bertha Cooper, Rhone’s girlfriend, which would indicate Charlotte had lied on the stand. In Cooper’s statement to police investigator Danny Knight, which was provided to the defense in discovery, Cooper stated that she, Robert, and Mary Ann left the club in her vehicle, not Mary Ann’s, and Charlotte was not present. Cooper, however, was not called to testify at trial, nor was she subpoenaed by the defense. Because Williams did not impeach Charlotte’s testimony on cross-examination with Cooper’s contradictory statement, Robert claims his defense was prejudiced. However, Cooper was not called to testify at the post-conviction relief hearing as to what she would have stated at trial if called as a witness.
 

 ¶ 21. After reviewing the trial transcript, we find Williams adequately examined Charlotte on cross and attempted to impeach her testimony about Robert’s “admitting” that he had shot Cross. Williams elicited from Charlotte that Robert never stated to her that he had shot Cross a certain number of times, just that he had fired his gun. We cannot conclude that a more detailed cross-examination by Williams would have changed the outcome of the trial.
 

 ¶ 22. Robert has not proven that these alleged omissions by Williams regarding the trial witnesses, in and of themselves, would have substantially changed the result of the trial. Williams admitted at the hearing that it is difficult to predict what a witness will do on the stand at trial. We find no merit to Robert’s contentions.
 

 2. Ballistics Evidence
 

 ¶ 23. Robert also argues that Williams’s performance was deficient in failing to have the shell casings found at the club and the bullet found in the victim’s body sent to the Mississippi Crime Laboratory for ballistic comparison tests. Additionally, Robert claims that Williams should have objected at trial to allowing the testimony of Dr. Steven Hayne, a forensic pathologist, who testified about the victim’s cause of death. Robert claims Dr. Hayne testified outside of his area of expertise about the type of bullet recovered from Cross’s body. Robert admits, though, that these omissions, in and of themselves, would not have swayed the jury’s verdict, but taken cumulatively, they could have impacted the trial’s outcome.
 

 ¶ 24. Robert claims a ballistic comparison would have shown whether or not the shell casings were all fired from the same weapon, and the caliber and brand of ammunition used. He states the test results might have eliminated his handgun, a nine millimeter, as the lethal weapon, if all the casings were found to be a different caliber. However, Officer Knight testified all of the shell casings he found were nine millimeter and were at the crime lab. While Robert speculates as to what additional examination might have revealed, this is insüfficient to establish ineffective assistance of counsel. Robert
 
 *1242
 
 has to prove by a preponderance of evidence that tests would have revealed these differences, and he did not. Since the shell casings are apparently no longer available, he cannot meet this burden.
 

 ¶ 25. Robert also claims Williams should have objected to Dr. Hayne’s testimony on direct examination that the fatal shots were fired with a “Black Talon” bullet, which is the kind of bullet Robert told law enforcement he had in his firearm that night. Robert speculates that if the bullet in Cross’s body was determined not to be a nine millimeter or a “Black Talon” bullet, it would have rendered his statement about the bullets inconsistent, and he would have been acquitted.
 

 ¶ 26. We do not agree that these contentions, taken either individually or cumulatively, would have resulted in a “not guilty” verdict. Whether or not to have certain tests done on evidence, especially in ballistics, is a tactical decision. It may have been better for Williams not to know this information, because if the ballistics test results came back matching the shell casings or the bullet to Robert’s handgun, it could have greatly undermined Robert’s defense. Apparently, the State found the shell casings were from a nine millimeter firearm; so any testing ordered by Williams would have not aided his defense.
 

 ¶27. Further, we do not find Dr. Hayne’s testimony on the ballistics prejudiced Robei’t to the extent that he was denied a fair trial. Williams adequately cross-examined Dr. Hayne about his ballistics statements. At the hearing, Williams admitted that Dr. Hayne would have undoubtedly seen a wound made from a “Black Talon” bullet in his prior extensive experience as a forensic pathologist, and this issue would fall under his area of expertise.
 

 ¶ 28. Accordingly, we affirm the trial court’s detei'mination that Robert has failed to prove by a preponderance of the evidence that his defense counsel’s inac-tions resulted in a prejudicial outcome to his trial.
 

 3. Preparation
 

 ¶ 29. Robei’t complains that Williams failed to conduct the minimum amount of investigation requii’ed for rendering competent assistance during the initial investigative and discovery stage of his case. He cites
 
 Payton v. State,
 
 708 So.2d 559, 561 (¶ 7) (Miss.1998) for the proposition that “counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case.”
 

 ¶ 30. Robei't claims Williams never questioned him about the entire circumstances surrounding the shooting, and if Williams had spent more time interviewing him, Williams would have uncovered key pieces of evidence that would have resulted in a “not guilty” vei’dict. Also, Williams did not redact portions of the statement Robert gave to law enforcement, which was entered into evidence, that contained references to Robert’s gang affiliation and the previous crimes by the victim. Finally, Robert argues Williams failed to subpoena certain key witnesses until the day of the trial, which shows Williams’s total lack of preparation for trial.
 

 ¶ 31. Robert analogizes the instant case to
 
 Johns v. State,
 
 926 So.2d 188, 190 (¶ 2) (Miss.2006), where the supreme court reversed and remanded the defendant’s conviction for a new trial because Oliver Johns did not receive constitutionally effective assistance of counsel. Both the State, at the post-conviction relief hearing, and the circuit court, in its opinion, distinguished
 
 Johns
 
 from Robert’s case. We agree with the circuit court that while there are some factual similarities between
 
 Johns
 
 and the instant case, the cases are quite different.
 

 ¶ 32. In
 
 Johns,
 
 the attorney at issue did very little preparation or discovery in the
 
 *1243
 
 short time he had before trial (an omnibus hearing set trial less than a month away, and it was forty-nine days from the indictment to the verdict).
 
 Id.
 
 at 193 (¶ 19), 195 (¶ 33), 197 (¶ 42). Counsel filed no pretrial pleadings.
 
 Id.
 
 at 195 (¶ 34). Johns’s primary argument was that his counsel failed to interview alibi witnesses that were provided to him before trial.
 
 Id.
 
 at 196 (¶ 38). The morning of the trial was the first time Johns found out that his counsel was not going to call any witnesses in his defense.
 
 Id.
 
 at 195 (¶ 26). Johns’s parents were so disappointed at his counsel’s performance at trial that they attempted to find another attorney midway through the trial.
 
 Id.
 
 at 195 (¶ 28). The supreme court concluded that counsel’s failure to investigate the case prejudiced Johns because the testimony of the alibi witnesses, coupled with the fact there was no physical evidence to convict Johns, could have changed the outcome of the trial.
 
 Id.
 
 at 200 (¶ 54).
 

 ¶ 33. In the instant case, Williams admitted he was very hopeful about Robert’s case until the jury reached its verdict. Then, Williams “was very upset at the verdict.... I doubted they were fair.... I just felt like it needed to come to this [post-conviction relief].” But the record indicates Williams investigated the case and was prepared for the trial. Williams had eight to nine months to prepare for trial. He testified, during his cross-examination, that he felt prepared by the May 2000 trial date. The evidence presented during the post-conviction relief hearing shows Williams’s adequate preparation: he interviewed numerous potential witnesses, took pages of pretrial notes on the case, visited the scene of the crime, did what he could to try to obtain the photographic lineup from law enforcement, researched the legal issues, attempted to issue subpoenas on all appropriate witnesses, and met with his client.
 

 ¶ 34. Specifically, Williams attempted to find Debra and other witnesses to testify in Robert’s defense by hiring a private investigator.
 
 [6]
 
 While perhaps Williams should have done more “in person” investigating, we find this potential deficiency did not change the outcome of the trial. Williams did personally visit the crime scene and attempted to obtain a copy of the photographic lineup used by law enforcement, but he was told the officers could not locate it.
 

 ¶ 35. Williams met with Robert prior to trial in order to prepare, not to solicit payment for his services, as in
 
 Johns.
 
 While Williams did not subpoena Glass or Rhone until the day of trial, the trial judge accepted them as witnesses.
 
 [7]
 
 Williams had subpoenas issued for two other witnesses prior to trial, including Cedric. Also, Williams submitted to the court a list of witnesses that included thirteen individuals. Williams additionally filed a post-trial motion for a new trial or, in the alternative, a judgment notwithstanding the verdict, listing sixteen points of error.
 

 ¶ 36. The first day of the trial, Williams filed a motion to suppress certain statements made by Robert and his wife to law enforcement officers who were investigating the case. While the motion was denied, Williams argued that the statements were involuntary. He made numerous objections during the hearing on the motion. Also, Robert had no alibi witnesses in his
 
 *1244
 
 defense to call, unlike the situation in
 
 Johns;
 
 instead, Williams called Rhone, Debra, and another individual to testify. Rhone and Debra were at the crime scene and were adequately examined about their versions of the incident. During direct examination by the defense, Rhone testified that prior to the fight, Glass had warned that if Cross kept on “messing with [him],” he was going to have to “steel him,” or start a fight with him. Based on the foregoing, we cannot find Williams was incompetent regarding his preparation in this case.
 

 ¶ 37. Further, we find Williams’s failure to redact Robert’s statement about his gang affiliation did not prejudice the outcome of his trial when considered under the totality of the circumstances. In an interview with Officer Knight, Robert admitted he was a Crip, but not an active member. He stated that he did not know, until after the murder, that Cross was a member of a rival gang, the Vice Lords. Additionally, Robert said in his statement that the two gangs were “alright”; that is, they were not in conflict at the time. We cannot find that this statement so prejudiced the defense so as to affect the outcome of the case.
 

 ¶ 38. Interestingly, there is no evidence Robert was in any way dissatisfied with his counsel’s performance until the filing of the instant motion, unlike in
 
 Johns.
 
 In fact, by all of the evidence, Robert appeared to be quite pleased with Williams’s representation, and he even wrote Williams unsolicited letters from prison naming other possible clients. Robert kept Williams as counsel on his direct appeal. Moreover, even after losing his direct appeal, the evidence shows Robert wanted to keep Williams as his counsel for a post-conviction relief challenge. Robert stated in this regard, in a letter from prison, “I don’t think there is anyone more qualified for the job.” The record shows Robert’s family paid Williams to draft, and Williams admitted he did draft, the necessary application for post-conviction relief filed with the supreme court, as well as the post-conviction relief motion itself before the circuit court wherein he claimed his own ineffectiveness, even though the motion was entitled “pro se.”
 

 ¶ 39. Based on the foregoing, we cannot conclude that the trial court erred in finding that Williams’s alleged deficiencies in his investigation of the case and preparation for trial did not affect the outcome of his case.
 

 CONCLUSION
 

 ¶ 40. We find the evidence supports the findings of fact made by the circuit court judge. Robert did not prove his claim of ineffective assistance of counsel. While Williams may have made some mistakes, Robert received constitutionally effective assistance of counsel at trial and on direct appeal, as we cannot find that any of Williams’s alleged errors or deficiencies substantially affected the outcome of Robert’s trial. An unexpected jury verdict is not grounds for ineffective assistance of counsel. Accordingly, we affirm the circuit court’s denial of Robert’s motion for post-conviction relief.
 

 ¶ 41. THE JUDGMENT
 
 OF THE
 
 CIRCUIT COURT OF KEMPER COUNTY DENYING THE MOTION FOR POST-CONVICTION RELIEF IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR. ROBERTS, J., NOT PARTICIPATING.
 

 [1]
 

 .
 
 Robert v. State,
 
 821 So.2d 812 (Miss.2002).
 

 [2]
 

 . Ruffin exercised his Fifth Amendment right not to testify at Robert’s trial.
 
 See
 
 U.S. Const. amend. V.
 

 [3]
 

 . Williams testified at the hearing that: a complaint was filed against him with the Mississippi Bar for these actions; it was resolved; and he was disciplined by the Bar, but there is no further information in the record about this matter.
 

 [4]
 

 . We note the record was inadequate on appeal; both Robert and the State erred in this regard. Robert only designated the order denying his motion to reconsider his post-conviction relief motion, his notice of appeal, an original and corrected sentencing mandate from the supreme court, and the direct examination of Williams. We find that, pursuant to Mississippi Rule of Appellate Procedure 10(b)(2), this designation was inadequate. Since Robert is contending that the court's ruling was contrary to the evidence, he should have designated the "transcript of all evidence relevant to such finding,” not just the evidence favorable to his position. Not in-eluded in the record was Robert's post-conviction relief motion with Williams's attached affidavit enumerating his incompetence, any response by the State to the motion, Williams’s cross-examination at the remainder of the hearing, and the twenty-six exhibits entered into evidence at the hearing. The State made no effort to correct the record to include these matters pursuant to Rule 10(b)(5) or 10(e). This Court did so on its own initiative. Further, this Court had the original trial transcript from the direct appeal available for review and relied upon all of these materials in thoroughly reviewing the issues before the Court.
 

 [5]
 

 . In his brief, Robert does not discuss several of the alleged deficiencies he raised at the evidentiary hearing before the circuit court. Accordingly, these allegations are deemed abandoned.
 
 Holloman v. State,
 
 656 So.2d 1134, 1141 (Miss.1995) (citing
 
 Magee v. State,
 
 542 So.2d 228, 234 (Miss.1989)).
 

 [6]
 

 . Debra purposefully had been avoiding service of the subpoena, supposedly because she was "afraid.” Williams was finally able to locate her, and she was properly served a subpoena three weeks before trial, according to the trial transcript. Debra was not at the courthouse when the defense called her initially, but she did testify on the second day of trial.
 

 [7]
 

 . Rhone testified for the defense, but Glass did not.