# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01086-COA

**ANGELA WHITEHEAD A/K/A NIKKI A/K/A**         **APPELLANT**
**ANGELA NICHOLE WHITEHEAD**

**v.**

**STATE OF MISSISSIPPI**         **APPELLEE**

DATE OF JUDGMENT:      06/26/2018
TRIAL JUDGE:      HON. JOSEPH H. LOPER JR.
COURT FROM WHICH APPEALED:      ATTALA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      CYNTHIA ANN STEWART
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
     BY: BARBARA WAKELAND BYRD
NATURE OF THE CASE:      CIVIL - POSTCONVICTION RELIEF
DISPOSITION:      AFFIRMED - 02/11/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.

## CARLTON, P.J., FOR THE COURT:

¶1. Angela Whitehead filed a motion for postconviction relief (PCR) claiming that she received ineffective assistance of counsel. After an evidentiary hearing, the Attala County Circuit Court entered an order denying Whitehead's PCR motion. Whitehead now appeals the trial court's denial of her PCR motion.

¶2. After our review, we find that Whitehead failed to meet her burden of showing that her counsel's performance was deficient. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Magee v. State*, 270 So. 3d 225, 229 (¶16) (Miss. Ct. App. 2018) (setting forth standard for proving ineffective assistance of counsel in the context of a guilty plea).

Whitehead also failed to meet her burden of showing that her guilty pleas were invalid. Finding no error, we affirm the trial court's judgment.

**FACTS**

¶3. On February 3, 2015, Whitehead was indicted on the following charges: possession of methamphetamine, grand larceny, burglary of a dwelling, drive-by shooting, shooting into a dwelling house, escape of a person under arrest or custody, and possession of contraband. In its brief, the State asserts that based on the charges, the maximum sentence Whitehead faced was ninety-three years[1] in the custody of the Mississippi Department of Corrections (MDOC) and $95,000 in fines.

¶4. On March 4, 2015, Whitehead signed petitions to enter guilty pleas on the following charges: possession of methamphetamine, grand larceny, shooting into a dwelling house, and escape. By signing the plea petitions, Whitehead confirmed that her defense counsel, Richard Carter, counseled and advised her on the nature of each charge, on any and all lesser-included charges, and on all possible defenses that Whitehead might have in the case. Whitehead also confirmed that her attorney advised her as to the probabilities of her conviction on her charges and thoroughly discussed all aspects of her case with her. Whitehead confirmed that Carter made no threats or promises of any type or kind to induce her to enter a guilty plea. Most importantly, by signing her plea petitions, Whitehead confirmed that she was satisfied with the advice and help Carter had provided her.

¶5. Regarding her competency and drug use, Whitehead signed her guilty plea petitions

---

[1] The transcript from the evidentiary hearing reflects the trial court referencing the maximum sentence as 108 years.

2

and confirmed that her physical and mental health "is presently satisfactory" and that she was not under the influence of any drugs or intoxicants.

¶6. That same day, March 4, 2015, the trial court held a plea hearing where Whitehead entered her guilty pleas. At the plea hearing, Carter confirmed under oath that he went over the contents of the plea petitions with Whitehead and that Whitehead understood all of her constitutional rights and also the consequences of pleading guilty to the charges.

¶7. Whitehead also confirmed, under oath, that she read the plea petitions and that Carter went over the plea petitions with her. Whitehead swore that she was not under the influence of any drugs, alcohol, or intoxicants at the time of the hearing.

¶8. Regarding Carter's representation of her, Whitehead confirmed that Carter met her expectations of what she believed a lawyer representing her should do for her; that she had no complaints about his representation of her; and that she was completely and totally satisfied with Carter's representation of her. Whitehead also confirmed that Carter went over all of her charges with her as well as any possible defenses.

¶9. The trial court accepted Whitehead's guilty pleas as "freely, knowingly, voluntarily, and intelligently made." The trial court then sentenced Whitehead to serve a total of fifteen years in the custody of the MDOC: three years for the possession of methamphetamine conviction, five years for the grand-larceny conviction, five years for the shooting-into-a-dwelling conviction, and two years for the escape conviction. The trial court ordered the sentences to run consecutively. The trial court also ordered Whitehead to receive long-term treatment for her alcohol and drug problems.

3

¶10.    Whitehead filed a PCR motion on September 6, 2017, claiming that her defense counsel, Carter, rendered ineffective assistance of counsel. Whitehead specifically alleged that (1) Carter instructed her to tell the trial judge that he had gone over her plea petition with her even though he failed to do so; (2) Carter failed to go over any discovery materials with her; (3) Whitehead was misinformed about the consequences of her guilty plea; (4) Carter had discouraged Whitehead's mother's suggestion that Whitehead would be able to appeal her conviction if she proceeded to trial; (5) Carter told Whitehead she would be eligible for early release in order to persuade her to make a rushed decision to plead guilty; and (6) Carter told her that if she did not plead guilty, she would be convicted and would be sentenced to life without parole. In support of her claims, Whitehead attached the following exhibits to her PCR motion: (1) two affidavits from her mother, Violet Whitehead, signed on July 7, 2017;[2] (2) an affidavit from Whitehead's aunt, Coretha Conn, signed on May 5, 2017; (3) medical records from Whitehead's appointments with a family medicine doctor; (4) medical records from Whitehead's appointment with a psychiatrist; (5) medical records from her December 3, 2007 appointment with a rheumatologist; (6) medical records from Life Help Mental Health Services, Whitehead's court-ordered rehab, from March 11–31, 2015; (7) an affidavit from Freida Bohren, Whitehead's aunt, signed on July 20, 2017; and (8) an independent mental evaluation of Whitehead performed on December 10, 2016, by Dr. Mark Webb, a psychiatrist.

¶11.    On February 13, 2018, the trial court conducted an evidentiary hearing on

---

[2] One affidavit primarily addressed Carter's representation of Whitehead, and the second affidavit primarily addressed Whitehead's competency.

Whitehead's PCR motion. At the evidentiary hearing, the trial court heard testimony from Carter and Dr. Webb, the psychiatrist who performed an independent mental evaluation of Whitehead on December 10, 2016, while she was in the custody of the Central Mississippi Correctional Facility (CMCF). The trial court also heard testimony from Violet's mother, aunt, and uncle.

¶12. On June 28, 2018, the trial court entered its order denying Whitehead's PCR motion. The trial court provided a thorough opinion setting forth its findings, which we will quote at length in our discussion below. The trial court stated that it found no evidence that Whitehead lacked the mental competency to enter her guilty pleas, explaining:

> This court has reviewed the transcript of Whitehead's guilty plea proceedings, as well as her Petition to Enter Plea of Guilty. She testified under oath that she did not have any mental disabilities that would affect her ability to understand the criminal proceedings that were being conducted. She stated the same thing under oath in the Petition to Enter Plea of Guilty. This court had an opportunity to observe Whitehead during the plea proceedings and has reviewed her responses to this court's questioning of her during those proceedings. There is nothing from a review of those proceedings that would suggest, or in any way indicate that Whitehead was not mentally competent to enter a guilty plea.

¶13. The trial court also held that after hearing testimony and reviewing the evidence, it found no merit to Whitehead's claims that Carter failed to go over the guilty plea petitions or discovery with her or that Carter failed to properly investigate the case.

¶14. Whitehead timely appealed the trial court's order denying her PCR motion.

**STANDARD OF REVIEW**

¶15. The Mississippi Supreme Court has established that "[o]n appeal, the appropriate standard of review for denial of post[]conviction relief after an evidentiary hearing is the

5

clearly erroneous standard." *Johns v. State*, 926 So. 2d 188, 194 (¶29) (Miss. 2006). The supreme court has explained that "[a] finding of fact is 'clearly erroneous' when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been made." *Id*. at 196 (¶36). "However, when reviewing issues of law, this Court's proper standard of review is de novo." *Kidd v. State*, 221 So. 3d 1041, 1043 (¶8) (Miss. Ct. App. 2016). As the PCR movant, Whitehead "has the burden of showing [s]he is entitled to relief by a preponderance of the evidence." *Id*.

## DISCUSSION

¶16. Whitehead argues that she was denied effective assistance of counsel in violation of the Mississippi and United States Constitutions, and therefore the trial court erred in denying her PCR motion. To prevail on her claim of ineffective assistance of counsel, Whitehead must show (1) her counsel's performance was deficient, and (2) the deficiency was prejudicial. *Strickland*, 466 U.S. at 687. An attorney is deficient if he fails to meet "an objective standard of reasonableness." *Id*. at 688. "The [movant] must show unprofessional errors of substantial gravity, and allege such facts with specificity and detail." *Magee*, 270 So. 3d at 229 (¶16) (internal quotation marks omitted). However, "a strong presumption [exists] that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Furthermore, "[t]here is no constitutional right . . . to errorless counsel." *Woodward v. State*, 843 So. 2d 1, 7 (¶14) (Miss. 2003).

¶17. In the present case, Whitehead entered a guilty plea. Our supreme court "has held that

6

where a defendant voluntarily pleads guilty to an offense, he waives all non-jurisdictional rights incident to trial . . . ." *Hill v. State*, 60 So. 3d 824, 827 (¶6) (Miss. Ct. App. 2011). "This 'waiver includes all claims of ineffective assistance of counsel, except insofar as the alleged ineffectiveness relates to the voluntariness of the giving of the guilty plea.'" *Id*. (quoting *United States v. Cavitt*, 550 F.3d 430, 441 (5th Cir. 2008)). When a defendant claims that they received ineffective assistance of counsel "[i]n the context of a guilty plea, the defendant must show that [her] counsel's errors proximately resulted in the guilty plea and, but for counsel's error, the defendant would not have entered the guilty plea." *Magee*, 270 So. 3d at 229 (¶16) (internal quotation marks omitted); *see also Gill v. State*, 269 So. 3d 207, 215 (¶28) (Miss. Ct. App. 2018) ("Since [the movant] pleaded guilty, he 'must show that, were it not for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'").

¶18.    With regard to guilty pleas, this Court has recognized:

> It is the lawyer's duty to ascertain if the plea is entered voluntarily and knowingly. He must actually and substantially assist his client in deciding whether to plead guilty. It is his job to provide the accused an understanding of the law in relation to the facts. The advice he gives need not be perfect, but it must be reasonably competent. His advice should permit the accused to make an informed and conscious choice.

*Hill*, 60 So. 3d at 827 (¶5) (quoting *Childress v. Johnson*, 103 F.3d 1221, 1227 (5th Cir. 1997)). This Court has held that "[a] guilty plea is valid if it is entered into voluntarily, knowingly, and intelligently." *Yates v. State*, 226 So. 3d 614, 619 (¶16) (Miss. Ct. App. 2017) (internal quotation mark omitted). "To determine whether the plea is voluntarily and intelligently given, the trial court must advise the defendant of his rights, the nature of the

7

charge against him, as well as the consequences of the plea." *Id*. (internal quotation mark omitted). Whitehead bears the burden of proving by a preponderance of the evidence that her guilty plea was invalid. *Id*.

## I.    Reviewing Discovery and Plea Petition

¶19.    Whitehead first asserts that her trial counsel was ineffective because he failed to spend a sufficient amount of time with her explaining her plea petitions and that he failed to review all of the discovery with her before Whitehead entered her pleas. Whitehead claims that when she asked Carter why he would not give her the discovery regarding her case, he answered: "I'm not giving you the discovery, I'm not copying all that s\*\*t, it will take hours." Whitehead also maintains that Carter did not review her plea with her; rather, he advised her to tell the trial court that he did. In support of her claims, Whitehead attached to her PCR motion affidavits from her mother, Violet, and her aunt, Coretha. Both Violet and Coretha stated that they were present while Carter met with Whitehead on the day of her plea hearing.

¶20.    As stated, on February 13, 2018, the trial court conducted an evidentiary hearing on Whitehead's PCR motion, where the trial court heard testimony from Violet, Coretha, and Carter regarding Whitehead's claims that Carter was ineffective for failing to go over discovery with her and for failing to spend a sufficient amount of time with her explaining her case.

¶21.    Violet testified at the evidentiary hearing regarding the statements in her affidavit. Violet stated that on the day of Whitehead's plea hearing, Carter kept telling Whitehead,

"You need to plea for five years." Violet stated that she thought that Whitehead would only have to serve half of a five-year sentence. Violet testified that Carter also told Whitehead that "if she did not want to go to prison for life without parole, that she had to take that plea and that she had ten minutes to do it." Violet also stated that when she questioned Carter, he asked her: "[D]o you want to be the reason your daughter spends life in prison without parole[?]"

¶22. Violet also testified that Whitehead told Carter that she was not guilty of shooting into a dwelling or grand larceny, and Whitehead therefore did not want to take a plea deal. When Violet inquired about appealing if Whitehead went to trial and was found guilty, Carter allegedly responded, "Do you know how many years she'll be there before you get it appealed?"

¶23. As far as going over the plea petitions with Whitehead, Violet stated that Carter gave Whitehead the paper work to sign and told her, "I'm supposed to read all of this to you, but I don't have time. The judge is waiting." Violet testified that Carter "started skimming through stuff really fast," and said, "Here, I don't have time to do all this. Just sign here, here, and here."

¶24. Coretha also testified at the evidentiary hearing that she was present at the trial court on March 4, 2015, the date Carter met with Whitehead. Coretha stated that she heard Carter tell Whitehead that he was supposed to go over the plea-petition paperwork with her but that he would not do so. Coretha testified that Carter told Whitehead, "If the judge asks you if I read this to you, you tell him that I did read this to you. . . . And anything else the judge asks

9

you, you just answer yes."

¶25.    The trial court then questioned Coretha about her testimony that she heard Carter tell Whitehead to answer "yes" to anything the judge asked her at the plea hearing.  The trial court observed that despite Carter's alleged instruction, Whitehead answered "no" to some of the questions asked at the plea hearing:

> Well, on the other questions like for instance here, has anybody threatened you, frightened you[,] or forced you into this plea of guilty[,] so [Whitehead] said no. So she answered no to some questions. So if [Carter] told her to answer yes to every one, reckon why she didn't[?] . . . So obviously, if she was answering no when it was appropriate to say no and yes when it was appropriate to say yes, that would give some indication that she did know what she was doing, wouldn't it?

Coretha answered, "I don't know about that, sir . . . ."  The trial court then observed, "[Y]ou're giving this view that [Whitehead] somehow didn't know what she was doing.  But yet when you read the transcript, she says no when it was an appropriate response and yes when it was an appropriate response."  The trial court asked, "So just pray tell, what is it that you looked at that you think would indicate [Whitehead] didn't know what she was doing?"  Coretha responded, "Well, for one thing, I know that she had—she had said she had taken all the pills that she had been saving up while she was in [jail]."

¶26.    The trial court also heard testimony from Carter.  At the hearing, Carter testified that he went over the discovery materials that he had received from the State with Whitehead on "numerous" occasions.  Carter testified that Whitehead was able to assist him in preparing a defense, explaining "as far as defense, I know one time I met with her at the jail, she had handwritten witnesses she wanted me to contact and what she expected them to say."  Carter

10

confirmed that he did contact those witnesses. Carter also testified about the efforts he made in trying to prepare a defense for Whitehead:

> [W]ith regards to the most serious charges—the shooting into a dwelling and the drive-by—I went to the scene. I knocked on the door. [I] [c]ontacted Carlton Ashford who was a witness in that case. I attempted to contact the alleged victims in that matter so many times they complained -- well, [Assistant District Attorney Mike Howie] told me they had complained to [him] that I was harassing them and to quit calling them. That's how many times I contacted them. Numerous times.
>
> With regards to the grand larceny, I spoke with Jonathan Rhodes, Charlie Thrasher. These were witnesses that [Whitehead] had given me that might be beneficial to the case.
>
> . . . .
>
> I spoke to almost everybody she asked me to. Now, I should say when I went to the scene of the shooting, nobody came to the door. But somebody—I remember somebody was there. Like the curtain moved but nobody would answer the door.

¶27. Carter also testified that "[a]s far as understanding the whole process of what we were doing in court, [Whitehead] knew she had the option—or I believe she knew she had the option of going to trial on the charges or pleading on the charges." As to the possible sentences that Whitehead could receive, Carter testified that he did not tell Whitehead that she would be sentenced to life imprisonment if she failed to plead guilty to the charges; rather, he advised her of the maximum penalties possible for the crimes that she was accused of committing.

¶28. At the hearing, Carter confirmed that he went over the guilty plea petition with Whitehead on the day she pleaded guilty. Carter admitted that "I do remember that it was quick that day." Carter explained that to the best of his memory, he recalled that

11

Whitehead's plea hearing was the last item on the trial court's docket for the day. Carter testified that "everything else was over with, and [the trial court] was waiting around to see whether or not she was going to accept the last offer. And those discussions with not only her but at least one, maybe two—I think two of her family members took quite a while in discussing whether or not she wanted to accept that offer." Carter also testified that "that day, the State offered a lesser amount of time than what had previously been offered. . . . [Whitehead and I] discussed that. And we had discussed the plea offers before so we knew the—she knew the process of plea negotiations in my mind." Carter testified that to his recollection, Whitehead "was adamant that she did, in fact, want to take the plea deal the day that she plead."

¶29. In its order denying Whitehead's PCR motion, the trial court found Whitehead's claim that Carter failed to go over the guilty plea petitions with her "totally lacking in merit." The trial court explained that "[t]he transcript of Whitehead's guilty pleas, and Attorney Carter's testimony at the evidentiary hearing, totally refutes Whitehead's claim that Carter failed to go over the guilty plea petitions with her."

¶30. The trial court further found Whitehead's guilty plea transcript shows Whitehead confirmed that Carter made no threats or promises of any type to induce her to enter a guilty plea and that she entered her pleas freely and voluntarily. We recognize that "[s]tatements made in open court under oath carry a strong presumption of veracity." *Montalto v. State*, 119 So. 3d 1087, 1096 (¶18) (Miss. Ct. App. 2013) (internal quotation mark omitted). The trial court held that "[t]his court has been presented with nothing that would suggest that

12

Whitehead entered guilty pleas to the charges out of fear that she would be sentenced to life imprisonment if she went to trial." The trial court also determined that "[a] review of the transcript of the guilty plea shows that this court correctly advised Whitehead on the minimum and maximum sentences available for each of the crimes that she pled guilty to committing." The trial court held that "even if [Carter] had incorrectly advised Whitehead on the possible sentences available, it would be of no consequence since this court correctly advised her of the minimum and maximum sentences possible for the crimes that she committed."[3]

¶31.    As to Whitehead's claim that Carter failed to go over discovery materials with her and failed to properly investigate the case, the trial court held that "this court finds that the uncontradicted testimony that was offered at the evidentiary hearing shows that he did in fact go over the discovery materials with her and that he did properly investigate the case. Consequently, this court finds the claims to the contrary to be without merit."

¶32.    After reviewing the record before us, we find that as to this issue, Whitehead failed to meet her burden of showing that "[Carter's] errors proximately resulted in the guilty plea and, but for [Carter's] error, [Whitehead] would not have entered the guilty plea." *Magee*, 270 So. 3d at 229 (¶16). Whitehead therefore failed to meet her burden of proof on her ineffective-assistance-of-counsel claim. *See Strickland*, 466 U.S. at 687. Furthermore, even if error were proven, we would find Whitehead failed to show that "the outcome would have

---

[3] The trial court cited to *Britton v. State*, 130 So. 3d 90, 95 (¶17) (Miss. Ct. App. 2013), where this Court held that although PCR movant's plea petition misstated the maximum punishment, the trial court fully rectified this error by advising the movant of the correct maximum sentence.

been different had [s]he [had] proceeded to trial." *Williams v. State*, 220 So. 3d 996, 1002 (¶20) (Miss. Ct. App. 2017).

## II. Competency

¶33. Whitehead next argues that her trial counsel was deficient because he failed to challenge or investigate her competency on the date of the plea hearing. Whitehead asserts that Carter failed to inform the trial court about her mental issues despite speaking to her and her family members about these issues.

¶34. Uniform Rule of Circuit and County Court Practice 9.06 states in part, "If before or during trial the court, of its own motion or upon motion of an attorney, has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination . . . ."[4] The defendant "bears the burden of proof to show by substantial evidence that [her] competency to stand trial is in question." *Higginbotham v. State*, 122 So. 3d 1205, 1210 (¶14) (Miss. Ct. App. 2013). As the PCR movant, Whitehead bears the burden of proof to show that she lacked the competency to enter her guilty pleas. *Williams*, 220 So. 3d at 1000 (¶9).

¶35. To support her claim that Carter was deficient for failing to challenge or investigate her competency, Whitehead attached the following exhibits to her PCR motion: (1) two affidavits from her mother, Violet; (2) medical records from Whitehead's appointments with a family medicine doctor; (3) medical records from Whitehead's appointments with a

---

[4] We note that the Uniform Rules of Circuit and County Court Practice relating to criminal practice have been supplanted by the Mississippi Rules of Criminal Procedure, effective July 1, 2017. Because the former rules were still in effect at the time of Whitehead's guilty plea, Rule 9.06 is applicable to her case.

psychiatrist; (4) medical records from Life Help Mental Health Services, Whitehead's court-ordered rehab, from March 11–31, 2015; (5) an affidavit from Whitehead's aunt, Freida; and (6) an independent mental evaluation of Whitehead performed by Dr. Webb, a psychiatrist.

¶36. The record reflects that Violet signed two affidavits dated July 7, 2017: one affidavit that primarily addressed Carter's representation of Whitehead and a second affidavit that primarily addressed Whitehead's competency. In her first affidavit, Violet stated Whitehead told her that on the night before her plea hearing, she tried to commit suicide by ingesting twenty ibuprofen pills, twenty Tylenol pills, and fifteen-to-twenty Advil pills. Violet also recounted that while Whitehead was in jail after pleading guilty, Whitehead tried to commit suicide again. In Violet's second affidavit, which primarily addressed Whitehead's competency, Violet stated that "Carter . . . was told during multiple conversations with me that Angela's mental capacity to make an informed decision was limited." Violet further stated that "Carter made the statement that dealing with Angela was like dealing with a 13 year old and he would not put in a 'crazy plea' for her."

¶37. In Freida's affidavit, she stated that she met with Carter on March 26, 2015, and informed him that Whitehead had attempted suicide while in jail. Freida claimed that regarding Whitehead's burglary charge, she asked Carter, "How could you talk a young girl who has no ability to make good decisions into pleading guilty to all those charges when she repeatedly told you that all she did was go and get her puppy . . . from [the victim's] house? Don't you feel bad about that?" Freida stated that Carter responded, "I do kinda feel bad about it now." Freida stated that she told Carter that Whitehead was very smart but lacked

15

the ability to think things through and make good decisions. According to Freida, Carter agreed and said, "I know, her mother and I talked about how she acts like a 12 or 13 year old. I think she is stuck at the age she started doing drugs." Freida stated that she asked Carter to obtain a copy of Whitehead's mental evaluation from Life Help Mental Services and use that as evidence to show that she had made a mistake in accepting the plea bargain. Freida stated that she never heard back from Carter.

¶38. At the February 13, 2018 evidentiary hearing, the trial court heard testimony from Dr. Mark Webb, a psychiatrist who performed an independent mental evaluation of Whitehead on December 10, 2016, while she was in the custody of the CMCF. Dr. Webb testified that based on his examination of Whitehead and his review of her medical records from her family medicine doctor, psychiatrist, and rheumatologist, he concluded that she was bipolar and also suffered from attention deficit disorder (ADD). Dr. Webb opined that Whitehead was not competent to enter a guilty plea on March 4, 2015. Dr. Webb explained that Whitehead's bipolar disorder and ADD combined with the overdose of the medications tipped the scales in his conclusion that Whitehead was not competent to enter her guilty pleas.

¶39. Dr. Webb addressed Whitehead's claim that on the night before her plea hearing, Whitehead attempted to overdose on a combination of Tylenol and Advil:

> Advil is not so difficult lethality wise or lethal wise as it relates to Advil. It will just give you a horrendous stomachache if you take a bunch of Advil.
>
> Tylenol, on the other hand, is lethal at really not too many Tylenol. Ten or [fifteen] Tylenol will typically kill someone. And the way it kills you is it

shuts down your liver, which then makes you encephalopathic. Your brain doesn't work correctly. You have trouble with your thoughts and typically you die. It didn't happen with Ms. Whitehead, thank goodness. But every alcohol, every Tylenol ingestion does affect your liver. And excessive Tylenol will shut down your liver.

Dr. Webb explained that on the morning after ingesting as many pills as Whitehead claimed to have ingested, a person "would have been sedated and would have been groggy, sedated and typically some slurring of words and inability to think very well."

¶40. Dr. Webb testified that "you would never want someone to make a life-altering decision such as a plea hearing within 24 hours of a suicide attempt." However, Dr. Webb admitted that other than the statements from Violet and Whitehead, he had no independent verification that Whitehead actually attempted to overdose. Dr. Webb testified that he had not seen any documentation from the jail that would confirm Whitehead actually ingested the pills, and Dr. Webb could not confirm whether such documentation even existed. On cross-examination, the State asked Dr. Webb if he would question Whitehead's truthfulness about overdosing if the trial court or her lawyer did not pick up on any grogginess or slurred words at her plea hearing. Dr. Webb responded, "It would cause me to question it, yes. You would think someone would have noticed that she was altered and in her mentation and that she was having difficulty, either emotionally or physiologically, having tried to commit suicide the night before and/or the physiological effects of the medication."

¶41. Whitehead's family members also testified at the evidentiary hearing as to Whitehead's competency on the day she entered her guilty pleas. Violet testified that Whitehead had a history of mental health issues including bipolar disorder and ADHD.

17

Violet stated that she tried to persuade Carter to have Whitehead evaluated to determine her mentally competent. Violet testified that she did not believe that Whitehead was competent to enter her guilty pleas on March 4, 2015, explaining, "She just seemed very out of it. She just—she would talk about one thing and then jump to another. . . . I kept asking her if she was okay, and she would just kind of shrug." Violet also testified that Whitehead's eyes were "glassy looking" and she "just seemed very tired" and "very stressed."

¶42. Coretha and Marcus Burkes also testified that Whitehead had a history of mental-health issues. Coretha testified that she met with Carter, Whitehead, and Violet on the day Whitehead entered her guilty pleas, and in her opinion, Whitehead was not competent that day. Coretha described that Whitehead looked like she did not know what was going on.

¶43. The transcript reflects that Whitehead was in jail on the night before her plea hearing when she allegedly overdosed on Advil and Tylenol. The trial court questioned Coretha about Whitehead's alleged overdose. The transcript reflects the following dialogue:

COURT: Reckon how [Whitehead] was able to keep all those drugs in the jail and nobody know them?

[Coretha]: Come on, Judge Loper.

COURT: Well, did you smuggle some in to her?

[Coretha]: No, I didn't. But anybody could ask for Advil or anybody could ask for Tylenol.

COURT: I don't think they give you the bottle, do they?

[Coretha]: No. But there was about ten girls with her in the jail cell.

COURT: And y'all didn't think it was important enough, though, to tell her lawyer or anybody else that she had taken—

18

[Coretha]:    I didn't know at the time—

COURT:       Okay.  So nobody knew until after the fact that she claims to
             have taken the pills?

[Coretha]:    After—during the time she tried to commit suicide—

COURT:       The second time?

[Coretha]:    Yeah.

COURT:       So if that happened the night before, . . . why do you think she
             didn't tell you or her mama the day that she plead guilty that,
             Hey, the night before, I chucked all these pills down?

[Coretha]:    I just think it's something she probably wouldn't have told us.
             I don't know.  I can't answer that.

¶44.    The trial court also heard testimony from Carter, who stated that on the day of

Whitehead's plea hearing, he did not observe Whitehead slurring her words, and she did not

appear under the influence of any substance.  Carter stated that he has dealt with clients in

the past who seemed high or under the influence of something on the day of their plea

hearing, and in those situations, he stopped the plea proceedings based on his belief that his

client was incapacitated.  Carter testified that if Whitehead had appeared under the influence

of any kind of medication on the day of her plea hearing, he would not have allowed her to

enter a plea that day.

¶45.    Carter testified that Whitehead's family alerted him that Whitehead suffered from past

mental issues.  Carter admitted that his notes from representing Whitehead "don't reflect that

I dug too hard as far as obtaining medical records or anything along those lines."  However,

he testified that "from my dealings with [Whitehead], I didn't see any reason that she would

19

be incompetent to move forward with her case." Carter testified that Whitehead "didn't inform me there were any ongoing health issues."

¶46. During cross-examination, Carter agreed that if he had possessed Whitehead's medical records showing she had been diagnosed with bipolar disorder and in the past had been admitted for treatment by psychiatrists, then he would have "typically" further investigated the matter of her competency. However, Carter testified that he did not see any signs that Whitehead was incompetent, explaining:

> Just because somebody has a history of treatment does not mean they're incompetent. And it's not fair to defense counsel to expect us to have competency hearings on every single client I represent. If that's the expectation, it's not possible. Did I see any signs that she was incompetent or unable to assist me in preparing for her trial? No, I didn't see that with [Whitehead].

¶47. As far as Violet's claim that Carter told her he would not enter a "crazy plea" for Whitehead, Carter testified that he "certainly didn't use those words. I'm not sure I've ever . . . termed it crazy plea. I mean, if that's referencing an insanity defense—I'm not even sure what that means. No. I didn't say that."

¶48. After the evidentiary hearing, the trial court entered an order denying Whitehead's PCR motion. In its order, the trial court explained that "[t]he most serious assertion in Whitehead's post-conviction motion is the claim that a competency examination should have been performed before she entered her guilty pleas, and that she was not competent on the day she entered her guilty pleas." The trial court determined that Carter and Whitehead "would have the best insight concerning [Whitehead's] competency." The trial court explained that "[a]lthough this court is sympathetic to the opinions of her mother, aunt, and

20

uncle, and while it respects Dr. Webb, none of them are in as good a position as Carter and Angela Whitehead to offer proof on that subject."

¶49. The trial court then held that it found no merit to Whitehead's claims that she lacked competency to enter her guilty pleas. The trial court explained that Carter testified at the evidentiary hearing that he had no difficulty communicating with Whitehead during any of the time that he represented her, including on the day of her guilty pleas. The trial court also stated that it reviewed the transcript of Whitehead's guilty plea proceedings as well as her plea petitions. The trial court found that Whitehead testified under oath and affirmed in her plea petitions that she did not have any mental disabilities that would affect her ability to understand the criminal proceedings that were being conducted. The trial court also explained that it had the opportunity to observe Whitehead during the plea proceedings and at the evidentiary hearing. As for Whitehead's plea proceedings, the trial court found nothing to suggest that Whitehead was not mentally competent to enter a guilty plea.

¶50. As for the evidentiary hearing, the trial court stated as follows:

> This court must also note that Angela Whitehead was present at the evidentiary hearing, but did not testify at it. When provided with a forum and an opportunity to do so, Whitehead offered no testimony that she was unable to communicate with her attorney, that she didn't understand the legal proceedings that were taking place, that she had overdosed on medications the previous night, or that she was under the influence of drugs when she entered her guilty plea. The only sworn testimony this court has from Whitehead is her testimony at the guilty plea proceedings that she was not under the influence of drugs or alcohol, that she was not suffering from any disabilities of mind, that she understood her constitutional rights, and that she understood the contents of the guilty plea petition. This court has been presented with absolutely nothing that would cause this court to question the accuracy and truthfulness of that testimony or the statements contained in her plea petition. This court finds as a matter of fact that Whitehead did not overdose the night

21

before her guilty pleas and that she was not under the influence of any medications when she entered her guilty pleas. This court finds as a matter of law that there was no reason for Whitehead to undergo a competency evaluation as outline in [Rule] 9.06 and that she was mentally competent when she entered her guilty pleas on March 4, 2015.

¶51. Regarding Dr. Webb's testimony that Whitehead lacked the mental competency to enter her guilty pleas, the trial court found that "[t]he basis for Dr. Webb's testimony that Whitehead was not competent to enter her guilty plea" was Whitehead's statements to Violet and Dr. Webb that she had overdosed on Tylenol and Advil the night before she entered her guilty pleas. The trial court stated that "[o]n the day that Whitehead entered her guilty pleas, she interacted with a number of people including jail personnel, sheriffs deputies, court bailiffs, her mother, her aunt, her attorney, and this court." The trial court observed, however, that "not one single person noticed any of the signs that Dr. Webb testified that one would expect to see from someone who had overdosed on Tylenol and Advil."

¶52. After reviewing the record before us, we find that Whitehead failed to meet her burden of proving that Carter rendered ineffective assistance of counsel for failing to investigate her competency prior to her plea hearing. *See Magee*, 270 So. 3d at 229 (¶16) ("In the context of a guilty plea, the defendant must show that his counsel's errors proximately resulted in the guilty plea and, but for counsel's error, the defendant would not have entered the guilty plea." (internal quotation marks omitted)). Whitehead also failed to show that her guilty plea was invalid. *See Yates v. State*, 226 So. 3d 614, 619 (¶16) (Miss. Ct. App. 2017).

**CONCLUSION**

22

¶53. We find that under *Strickland*, Whitehead failed to prove that her counsel's performance was deficient. Whitehead's allegations of ineffective assistance of counsel are contradicted by her own sworn representation in her plea petitions and at the plea hearing and the sworn testimony of her counsel at the evidentiary hearing. *See Yates*, 226 So. 3d at 619 (¶14). As stated, "[s]tatements made in open court under oath carry a strong presumption of veracity." *Montalto*, 119 So. 3d at 1096 (¶18) (internal quotation mark omitted). Accordingly, the trial court did not erroneously deny Whitehead's PCR motion.

¶54. **AFFIRMED.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**